UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                        :

PACKARD SQUARE LLC,               :        Civil Action No.
                                          :

              Plaintiff,          :

                                          :

          -against-            :        **COMPLAINT**
                                          :

CANYON PARTNERS LLC and
CANYON PARTNERS REAL ESTATE LLC,   :       **TRIAL BY JURY DEMANDED**
                                          :

             Defendants.        :
-------------------------------------------------------------X

Plaintiff Packard Square LLC ("Packard Square"), by its attorneys Dorsey & Whitney LLP,

complaining of Defendants Canyon Partners LLC and Canyon Partners Real Estate LLC allege

as follows:

<u>**NATURE OF THE ACTION**</u>

      1.      Packard Square is the developer of a luxury apartment and high-end retail

complex in Ann Arbor, Michigan.  Craig Schubiner, the manager of Packard Square, envisioned

the development after years of careful planning and financial investment.  As is typical in

development projects, Packard Square needed financing to complete the project.  It therefore

obtained a loan of up to $53.7 million from a single-purpose entity controlled by the Defendants.

Evidence, that only recently became available, reveals that the Defendants did not view the loan

as a traditional construction loan.  Rather, the Defendants, along with others known and

unknown to Packard Square, weaponized the loan from the very outset so they could use to it to

seize control of the Packard Square project and quickly steal Packard Square's equity in the

project for a fraction of its actual value.

      2.      Specifically, Defendants have engaged in a criminal scheme over the past 4 years

to defraud Packard Square by, among other things: (i) perpetrating a persistent and fraudulent

campaign of bogus default notices; (ii) fraudulently taking control of the Packard Square project through the appointment of a Receiver by perpetrating numerous lies to a State Court, and thereafter manipulating the Receiver to slow-down dramatically the construction progress, with the fraudulent goal of letting the Defendants charge exorbitant interest and fees to Packard Square in order to capture as quickly as possible Packard Square's equity in the project; (iii) precluding Packard Square from assuming the construction contracts entered into by the Receiver; (iv) preventing Packard Square from refinancing the loan with a legitimate lender by demanding payment of more than $50 million based upon delinquent fraudulently inflated payoff letters, which terms were designed to expire almost immediately after their issuance, as a condition of releasing their liens against the project; and (v) intentionally lying to the United States Bankruptcy Court about the project's value and debt balance to cause the dismissal of Packard Square's bankruptcy petition.

## THE PARTIES

3.      Plaintiff Packard Square is a limited liability company organized and existing under the laws of Michigan, which principal business is the construction of an apartment and ground floor retail complex in Ann Arbor, Michigan ("Packard Square project" or "project").

4.      Defendant Canyon Partners LLC ("Canyon Partners") is a limited liability company organized and existing under the laws of the State of Delaware, and which transacts its investment business in New York, with offices at 157 West 57th Street, New York, New York.

5.      Defendant Canyon Partners Real Estate LLC ("Canyon Partners Real Estate"), formerly doing business as Canyon Capital Realty Advisors LLC, is a limited liability company organized and existing under the laws of the State of Delaware, is the real estate investment arm of the Defendant Canyon Partners and transacts business in New York with offices at 157 West 57th Street, New York, New York.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the claims for relief arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § § 1961, *et. seq*., pursuant to 18 U.S.C. § 1964(c) and has supplemental jurisdiction arising over the claims for relief arising under New York law pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in the Southern District of New York pursuant to 18 U.S.C. § 1965(a) because it is a district in which the Defendants transact business and which certain members of the association-in-fact enterprise alleged below transact business and/or reside.

## COUNT I

## RACKETEERING

8.      This is an action against the Defendants for a violation of 18 U.S.C. § 1962(c).

9.      From in or about September 1, 2014, and through the filing of the complaint, the Defendants and others known and unknown to Packard Square, who were employed by and associated with the enterprise pleaded below, which engaged in and affected interstate and foreign commerce, did unlawfully, willfully, and knowingly conduct and participate, directly and indirectly, in the conduct of the enterprise through a pattern of racketeering activity, which included acts indictable under 18 U.S.C. § 1341 (relating to mail fraud), § 1343 (relating to wire fraud), § 1951 (relating to interference with commerce, robbery or extortion), and offenses involving fraud in connection with a case under title 11.

**I.      The Enterprise**

10.     During the course of the pattern of racketeering activity, the Defendants Canyon Partners and Canyon Partners Real Estate, along with others known and unknown to Packard Square, joined together as a union or group of individuals, associated in fact although not a legal

entity, for the common purpose of defrauding, and cheating Packard Square out of its equity in its apartment and retail complex in Ann Arbor, Michigan.  The Defendants, motivated by avarice and greed, (i) fabricated and caused loan defaults against Packard Square, when in fact there was no proper factual or good faith basis underlying these alleged defaults other than to corruptly seize control of Packard Square's equity (ii) generated false and fraudulent claims against Packard Square to extort loan concessions from Packard Square, and (iii) corrupted through lies, deception, and perjury the evidence presented in judicial systems in multiple state and federal courts, with the ultimate goal of stealing Packard Square's equity, which has significantly greater value than the putative "construction loan" extended by the Defendants to Packard Square by a single-purpose entity affiliate of the Defendants.

11.     The Defendants Canyon Partners and Canyon Partners Real Estate were the ringleaders and organizers of the association-in-fact enterprise through their officers, employees, and agents, John Plaga, Chief Financial Officer of Canyon Partners ("Plaga"); Jonathan Kaplan, General Counsel of Canyon Partners ("Kaplan"); Maria Stamolis, Co-Head of Canyon Partners Real Estate ("Stamolis"); Gerald Goldman, Managing Director of Canyon Partners Real Estate ("Goldman"); Kevin Scholz, Vice-President of Asset Management of Canyon Partners Real Estate ("Scholz"); Marti Page, Director Acquisitions of Canyon Partners Real Estate ("Page"); and, other entities and individuals including Canpartners Realty Holding Company IV LLC, that provided Packard Square with the loan term sheet; Can IV Packard Square LLC, which has no employees and is directed and controlled by Defendants and is the single-purpose entity lender of the funds to Packard Square; McKinley Inc., the Receiver ("Receiver"); Albert Berriz, the CEO of McKinley, Inc. ("Berriz"); Matthew Mason, the authorized representative and agent of the Receiver ("Mason"); Tina Van Curen ("Van Curen");  HG Assessment Corp., Van Curen's

company that acted as the Defendants' real estate consultant; O'Brien Construction, ("O'Brien") the construction company approved by the Defendants to replace the company performing the construction on the project, and Timothy Eisenbraun, the Defendants' expert who testified in the Bankruptcy Court.

12.     Stamolis, Goldman, Scholz, Page and others employed by the Defendant Canyon Partners Real Estate generally performed the day-to-day administration of the CAN IV Packard Square LLC loan, and the Defendant Canyon Partners' owners, partners and upper management, including but not limited to John Plaga and Jonathan Kaplan, directed and effectuated the major decisions with regard to the Packard Square loan, as further particularized in this complaint. Stamolis is a member of Canyon Partners' investment committee along with others from Canyon Partners and at times acted on behalf of both the closely interrelated Defendants.

## II.     The Pattern of Racketeering Activity

13.     It was an object of the pattern of racketeering activity that the Defendants and others, known and unknown to Packard Square, would devise schemes and artifices to defraud and for obtaining money in violation of the criminal mail fraud statute, 18 U.S.C. § 1341, and in violation of the criminal wire fraud statute, 18 U.S.C. § 1343.

14.     It was a further object of the pattern of racketeering activity that the Defendants and others, known and unknown to Packard Square, obstructed and affected commerce by extortion by obtaining money and property from Packard Square with its consent by instilling fear that it would immediately accelerate the entire loan to Packard Square at an interest rate of 16% in violation of the federal extortion statute, 18 U.S.C. § 1951.

15.     It was a further object of the pattern of racketeering activity that the Defendants and others, known and unknown to Packard Square, in response to Packard Square seeking protection from the federal bankruptcy court did knowingly and fraudulently make and cause to

be made false oaths and accounts in relation to the bankruptcy case in violation of Title 18
U.S.C. § 152.

16.     Predicated upon the violations of the above referenced federal criminal statutes,
the Defendants knowingly, willfully and intentionally perpetrated a massive fraudulent scheme
on Packard Square.  The object of that scheme was to steal Packard Square's assets.  In
furtherance of the object of that overall scheme, the Defendants engaged in separate schemes to
defraud by: 1)  weaponizing a purported loan of up to approximately $53.7 million to Packard
Square through a persistent fraudulent campaign of bogus default notices and extortion, 2) taking
control of the project through the appointment of a Receiver  (after Packard Square completed
the most difficult parts of the construction project) by: a) false, fictitious and fraudulent
statements to a State Court, as particularized further in this complaint, at a hearing in which they
obtained the appointment of the Receiver, b) manipulating the Receiver to dramatically slow
construction of the project to a pace that is a fraction of industry standards so the Defendants
could charge exorbitant interest and costs to Packard Square and capture quickly the equity in the
project, 3) precluding Packard Square from assuming construction contracts entered into by the
Receiver (even if the subject loan were to be refinanced), 4) preventing Packard Square from
refinancing the Defendants' loan with a legitimate lender by demanding payments based upon
fraudulently inflated payoff letters as a condition to releasing their liens against the project, and
5) intentionally lying to the United States Bankruptcy Court about the project's value and debt
balance to cause the dismissal of Packard Square's bankruptcy petition.

**III.    The Defendants' Scheme to Defraud by Weaponizing a Purported Loan of up to
approximately $53.7 Million to Steal Packard Square's Equity through a Persistent
and Fraudulent Campaign of Unjustified Default Notices and Extortion**

17.     Craig Schubiner is an experienced property developer and the manager of
Plaintiff Packard Square.  Drawing on decades of experience in the development and real estate

industries, Schubiner, a graduate of the University of California at Los Angeles, the holder of a Master's degree in Business Administration from the University of Michigan, and a licensed builder, envisioned in detail the Packard Square project after years of planning following the property's acquisition in 2001.

18.     After approximately $14 million was spent in acquiring the site, in conceptualizing and designing the project, and in obtaining the many necessary governmental approvals for the project, including unanimous site plan approvals at all city levels, Schubiner, after having been introduced through a New York real estate mortgage banker, met in New York on April 8, 2014 with Page.

19.     The purpose of the New York City meeting between Schubiner and Defendant Canyon Partners Real Estate was primarily to introduce the Packard Square project to the Defendants and to determine whether it was feasible for the Defendant Canyon Partners Real Estate to arrange for a conventional and appropriate loan to Packard Square for construction financing of the Packard Square project.

20.     Prior to entering into any loan agreement, and consistent with the allegations set forth below, the Defendants recognized the potential value of the Packard Square project and planned to steal the project by weaponizing any loan agreement to create and claim bogus and improper contract defaults and violations of the loan agreement to force Packard Square into default.  In a draft of a memorandum created prior to the signing of loan documents, the Defendants were already planning for a default and were clear "if a default occurs under the Loan, Canyon will be in a position to quickly take title and control the Property at a significant discount to value."

21.     On or about October 1, 2014, the Defendant Canyon Partners caused Can IV

- 7 -

Packard Square LLC, a Delaware liability company created by the Defendants for the purpose of making a loan to Packard Square, to sign a construction loan with Packard Square for up to a maximum amount of $53,783,184 (the "October 2014 Loan Documents").  Because the originally planned contractor for the project was unable to obtain a performance bond at the eleventh hour, the October 2014 Loan Documents were finalized to contain provisions for commencing site work before the Defendants approved a "replacement contractor."

22.     Immediately after the signing of the October 2014 Loan Documents and in direct contravention of the October 2014 Loan Documents, the Defendant Canyon Partners Real Estate refused to release the $2.65 million allocated for the purchase of the site adjacent to the project, located at 2500 Packard Street.  The Defendants also refused to allow the $2.65 million to be used for any purpose, despite charging interest thereon, even though prior to the closing of the October 2014 Loan Documents on September 24, 2014, Page had sent an email to Schubiner stating that those funds could instead be used for future cost overruns.

23.     Shortly after the signing of the October 2014 Loan Documents, the Defendants began a campaign of creating excuses not to extend the necessary funds to complete the project and then causing CAN IV Packard Square LLC to send default notices to Packard Square – repeatedly designed to place Packard Square in default with the object to steal the property and/or the equity therein at a significant discount.  On December 1, 2014, the Defendant Canyon Partners Real Estate caused a letter, executed by Stamolis as authorized signatory, to be sent through interstate wires and private and commercial interstate carrier falsely stating that Packard Square was in default because it had "neither executed a sitework contract nor commenced sitework."  The Defendant Canyon Partners then caused the charging of default interest at 16% on funds that they had not yet even disbursed to Packard Square and threatened foreclosure,

while at the same time demanding that Packard Square waive any and all claims against them. As of November 6, 2014, the Defendants, as their own attorney admitted in an email, had "not yet authorized commencement" of the site work and "[o]nce commencement is authorized we will review the NOC [Notice of Commencement] and provide comments, if any." As of the date of the first default notice, December 6, 2014, the Defendant Canyon Partners Real Estate had never authorized the site work. The fact that the Defendants generated the default notice under false pretenses is evidenced by the fact that it was the Defendants which delayed the execution of the site work contract and the commencement of the site work. Despite the Defendants' intentional delay of authorization, Packard Square started the site work on November 8, 2016.

24.    On December 19, 2014, the Defendant Canyon Partners Real Estate caused another default letter to be sent, executed by Stamolis as authorized signatory, through interstate wires and a commercial interstate carrier that falsely stated that Packard Square was in default because it had failed to name a "single" replacement contractor to replace the originally planned contractor who was unable to obtain the requisite $32 million performance bond prior to the October 1, 2014 loan closing. The nefarious nature and bad faith intent of this default notice is evidenced by the fact that on November 24, 2014, twenty-five (25) days before sending the default notice, Packard Square had sent a letter to the Defendant Canyon Partners Real Estate naming not one but three possible replacement contractors. Packard Square's letter had clearly met the intent of the extension requirement (which did not prohibit the naming of back-up alternative contractors) and was sent timely within the 5-day window allowed under the October 2014 Loan Documents. Moreover, the Defendants were also aware that two of the three suggested contractors had been reviewing the contract documents two weeks earlier, and Defendants raised no objections. Thus, the Defendant Canyon Partners Real Estate's alleged

defaults and concurrent refusal to release loan disbursements were not justified because naming more than one potential replacement contractor could not be a material default. In fact, maintaining back-up contractors until a contract was fully-executed was a necessary and prudent measure that was not precluded under the October 2014 Loan Documents. All told, the December 19, 2014 default letter delayed the project by over a month, which was all in furtherance of the Defendants' devious plan.

25.     After the Defendant Canyon Partners Real Estate's deliberate delays in approving a replacement contractor among the three proposed by Packard Square, on February 25, 2015, Packard Square eventually executed the construction contract with the replacement contractor, Quandel. But in furtherance of their fraudulent scheme, the Defendants refused to release funds for Packard Square's ongoing construction costs and forced Packard Square to fund construction costs, even though separately the Defendants were accruing default interest on the funds borrowed for these very costs in violation of the October 2014 Loan Agreements.

26.     Soon after the February 2015 execution of the Quandel contract, the Defendants caused further calculated delays and demanded unwarranted punishments, namely, that Packard Square execute an onerous Reinstatement and Amendment Agreement; pay more than $150,000.00 as a penalty; acknowledge in writing a loan default which has significant repercussions under the October 2014 Loan Documents; and, provide a waiver of all defaults against the Defendants and their entities.

27.     At first, Mr. Schubiner refused to accede to the Defendants' arbitrary and extortionate demands. In response, the Defendants caused their affiliate, CAN IV Packard Square LLC to retaliate by quickly accelerating the entire loan, calling it immediately due and payable, the consequences of which would have required Packard Square to pay 15% interest as

if the entire approximately $53.7 million had been loaned for a full year (when up to that point Packard Square had been advanced less than $6.3 million for less than six months) and despite the fact that vertical construction, the primary purpose of the approximate $53.7 million loan, had not yet begun.  In the acceleration letter, executed by Plaga as authorized signatory, the Defendants caused to be delivered to Packard Square on March 30, 2015, through interstate wires and a commercial interstate carrier, the Defendants falsely claimed that Packard Square breached the October 2014 Loan Documents for not purchasing the building adjacent to the Packard Square project (even though on September 24, 2014, the Defendant Canyon Partners Real Estate had, as alleged in paragraph 22 above, refused to let Packard Square purchase that building).  The acceleration letter demanded that Packard Square pay immediately $17,574,064.71.  The Defendants attempted to extort this fraudulent and unconscionable amount, even though they had advanced less than $6,300,000 to Packard Square and no payments whatsoever were due and payable at the time.

28.     Having been placed in fear of losing the project, Mr. Schubiner succumbed and signed the Reinstatement and Amendment Agreement, returning it with a cover note which stated: "I have not heard from outside counsel today so I am only signing this without the chance to get legal advice based on your stated instructions to [start] foreclosure if the deadline stated is missed.  I view this whole thing as incredibly unfair and unwarranted and I really wish I was not pressured to sign this."

29.     The Defendants immediately refused to accept the executed Reinstatement and Amendment Agreement unless Mr. Schubiner disavowed his cover note.  On March 29, 2015, confronted with no other choice, Mr. Schubiner was forced to submit to the Defendants' corrupt and extortionate demands and disavowed his cover note.  It was only at that point that the

Defendants finally approved the $32.3 million GMP [guaranteed maximum price] amendment with Quandel – but without extending the completion dates that were established for the prior contractor's start originally planned for mid-September of 2014.

30. Between on or about April 1, 2015, and March 1, 2016, the Defendants exploited Packard Square's expertise to complete the most difficult parts of the design, development and construction such as numerous governmental approvals, hundreds of pages of construction drawings, site work, underground piping, foundations, structure and framing of the project, windows, roof, the swimming pool, and a substantial portion of the mechanical, electrical, plumbing and fire suppression systems.

31. On or about March 14, 2016, Goldman reported to Stamolis in an email on his March 11, 2016 visit to the project. In that email Goldman wrote: "almost all of the windows are in and the framing is nearly complete," "[t]he work is progressing on schedule and on budget," and [t]here is no new apartment product comparable as Packard [Square] is one of the last remaining large infill sites."

32. Beginning in approximately April 2016, the Defendants, knowing that Packard Square's property was unique and that the value had dramatically increased, initiated further deceptive measures to fabricate defaults under the October 2014 Loan Documents. On or about April 21, 2016, the Defendant Canyon Partners Real Estate sent emails through interstate wires to Schubiner initiating bogus milestone extensions that could only be attributable to a foundation settlement issue that in fact affected for a short duration only approximately 2% to 3% of the project. Since 97% to 98% of the work was unaffected by this settlement issue, no written loan amendments were necessary to address this issue. However, as Packard Square later learned, the Defendants created these bogus milestone extensions to advance the Defendants' secret corrupt

agenda of placing the property in foreclosure to steal Packard Square's equity.

33.     In or about the spring of 2016 Goldman stated orally to Schubiner that the interim milestone amendment was a mere paperwork notation, and in an email on April 21, 2016, sent through interstate wires, Goldman informed Schubiner that "we want our loan to be in compliance" and that "[t]o entertain a change, we need the dates, thanks."  This was among the many misleading statements the Defendant Canyon Partners Real Estate made to Packard Square to create a false sense of trust.

34.     On or about May 31, 2016, Newbanks, the Defendants' construction consultant, notified the Defendants in their regular monthly reports of, among other things, force majeure events "affecting the Critical Path of the work such as main water connection, mechanical dampers and main electrical room concrete pad."  Concurrently, there were various force majeure issues including a labor dispute and strike involving the electricians for the project, and manpower issues in the marketplace, which affected the completion date for the project.  Instead of legitimately adjusting milestone dates for force majeure events as provided for in the October 2014 Loan Documents and rectifying the many earlier delays Defendants had intentionally caused, the Defendant Canyon Partners instead sought to exploit the situation by crafting loan amendments with unreasonably short deadlines for interim construction work, while simultaneously making false oral promises that future extensions would be granted as necessary. As later events revealed, this charade of providing unnecessary and intentionally short extensions of interim milestone dates was designed to create the misleading illusion that the Defendants had granted Packard Square many concessions.

35.     Defendants concealed the Newbanks reports from Packard Square, and on or about July 28, 2016, Scholz circulated to Goldman and an employee of the Defendant Canyon

Partners Real Estate, and without disclosure to Packard Square, a list of possible defaults by Packard Square as part of the Defendants' scheme to fabricate further false rationales to usurp Packard Square's project.

36.     In furtherance of that scheme, at a meeting at the project site on August 10, 2016, Page falsely assured Schubiner that the Defendants agreed with Packard Square regarding delays associated with force majeure events and other issues then associated with Quandel's performance and promised that the Defendants were going to extend the milestone dates as necessary for completion of the project, and that the Defendants would not be sending default notices to Packard Square.

37.     In direct contradiction to Page's assurances that the October 2014 Loan Documents would be complied with by Defendants by extending the milestone dates as necessary for completion of the project due to the force majeure events, the Defendants never extended the later interim milestone dates or the major milestone dates for completion.  Instead, the Defendants intentionally resumed their campaign of sending unjustified default notices, the only purpose of which was to set up Packard Square for default on the Defendants' loans.

38.     To intentionally cause issues and distress, the Defendants unilaterally only partially funded construction draws for June, July and August 2016 –while still charging interest on over $20 million of unreleased funds.  These illegitimate partial fundings, which the Defendants later caused to be admitted on December 12, 2016 in Requests for Admission in the State Court case, not only violated the October 2014 Loan Documents but caused severe financial hardship to Packard Square, rendering its performance impossible.  In furtherance of their overall scheme to defraud, the Defendants continued to cause unjustified default letters to be sent to Packard Square, often blaming Packard Square for repercussions caused intentionally

by the Defendants, by delivering the default letters through interstate wires and commercial

interstate carriers as set forth below by date and false and/or misleading reason for default:

| Date | False and/or Misleading Reason for Default |
| --- | --- |
| August 17, 2016 | Defendant Canyon Partners caused to be sent a letter, executed by Plaga as authorized signatory, falsely stating that "Borrower will not achieve Substantial Completion or Final Completion by the Substantial Completion Date or the Final Completion date," when in truth and in fact the Defendants knew there was not only no legitimate basis for this statement but any delay was attributable to 1) the Defendants who were not funding draws for the work that needed to be completed and 2) force majeure events. |
| August 26, 2016 | The Defendant Canyon Partners caused to be sent a letter, executed by Kaplan as authorized signatory, falsely stating "Borrower failed to complete Framing (which had been materially complete for months) MEP [mechanical electrical plumbing] Rough-Ins and Building Enclosure by August 26, 2016, when in truth and in fact the Defendants, based on Goldman's email, knew as of March 14, 2016 the framing was "nearly complete," (*See* paragraph 31 above) through their own consultant, Newbanks, and that the failure to fully complete the other items was legitimately caused by a city inspector directing that 450 fire dampers be added, of which Newbanks had informed the Defendants on June 13 and July 27, 2016, and was an event of force majeure resulting in excusable delay under the contract – among other force majeure events, including the foundation settlement issue, which subsequently delayed the building enclosure to a minor extent and for which the Defendants had full knowledge. |
| September 29, 2016 | The Defendant Canyon Partners caused to be sent a letter, executed by Kaplan as authorized signatory, falsely blaming Packard Square for failing "to complete the Parking Lot and Site Concrete by September 26, 2016," when this failure was intentionally caused by the Defendants failing to fund draws starting in June 2016 and failing to fund the contractor Jermor Plumbing to complete the underground plumbing before the Parking Lot and Site Concrete could be done. |
| October 19, 2016 | The Defendant Canyon Partners caused to be sent a letter, executed by Plaga as authorized signatory, corruptly placing responsibility on Packard Square for two liens totaling approximately $1.2 million, when in truth and fact the Defendants were responsible for the liens since they had purposely chose not to provide Packard Square with the funds to pay those liens, even after approving the amounts to be paid, to support their planned effort to have a Receiver appointed in the litigation it filed two days later. |
| October 21, 2016 | The Defendant Canyon Partners caused to be sent a letter, executed by Kaplan as authorized signatory, falsely stating that "Borrower failed to |

| Date | False and/or Misleading Reason for Default |
|------|---------------------------------------------|
|      | complete the Interior Finishes by October 20, 2016, as required," when in truth and in fact the Defendants knew that the above described MEP Rough-Ins were a prerequisite to completing the finishes and therefore, they were informed by their own consultant Newbanks of excusable events of force majeure and which force majeure events were compounded by the Defendants earlier caused delays as well as their failure to fully fund construction draws. |

39.    In furtherance of their prolonged fraudulent campaign, the Defendant Canyon

Partners Real Estate in or about September 2016, at a time when the project was 60% to 65%

complete, terminated the services of Newbanks, the nationally-respected consulting firm, which

was highly familiar with the project, after Newbanks disclosed repeatedly in writing the force

majeure events to Defendants and consistently rendered reports that favorably depicted Packard

Square's successful performance.  The actual reason for the termination of Newbanks was that

its reports of Packard Square's performance were too positive and glowing, and Newbanks

refused to follow the Defendants' directions that Newbanks falsify its reports and characterize

the project as being in shambles.

40.    Newbanks' termination preceded the then planned replacement of the troubled

construction manager, Quandel, which experienced company-wide staffing issues and other

problems.  Goldman repeatedly encouraged the immediate termination of Quandel and to even

ignore the notice requirements of the Quandel contract termination language.  Instead, Schubiner

followed the contract terms and identified C. E. Gleeson Constructors ("Gleeson") as the close-

out contractor to complete the building.  Pursuant to the Defendants' request, Schubiner sent to

the Defendants detailed financial and construction experience information regarding Gleeson,

along with a 6-month schedule for completion.  Despite many promises to respond to this

request, Goldman and the Defendants purposefully never responded to Schubiner – again leaving

- 16 -

the project in indefensible limbo while wasting Packard Square's time and money.

41.     In or about September 2016, knowing that the positive Newbanks reports would negate their planned scheme to seek a Receiver to assume control of the project (and while ensuring that the favorable Newbanks reports would continue to be concealed from Packard Square), the Defendants replaced Newbanks with New York-based Tina Van Curen, a former employee of the Defendants as their putative construction consultant and brought her to the site on September 15, 2016.  Concurrently, the Newbanks report, dated September 15, 2016, unbeknownst to Packard Square at the time, stated that "our firm did not identify any visually apparent unaddressed deficiencies.  The overall quality of the work that was visible and observed on the date of the site visit appeared to be in general conformance with industry standards and the intent of the construction plans & specifications."

42.     Suddenly on or about October 14, 2016, without advance warning, the Defendants, knowing that the value of the Packard Square project continued to increase in value, caused an email to be sent through interstate wires to Packard Square attaching a fully-drafted deed-in-lieu of foreclosure document which Stamolis testified on May 3, 2018 was designed to "wipe-out" Packard Square's ownership interest.  Through this document the Defendants sought to compel Packard Square to simply relinquish its property to the Defendants and its related entities despite the facts that (i) no loan payments by Packard Square were ever missed or late, (ii) all taxes and insurance premiums were paid by Packard Square on a timely basis, (iii) no city violations, or allegations of fraud or misappropriation of loan funds were ever made, (iv) more than $20 million was available in unreleased loan interest and construction reserves, (v) the loan maturity was not until April 1, 2017 and there were extension options until April 1, 2018, and (vi) the Defendants had no damages as there was no money due and unpaid at that time.  Of

course, Packard Square refused the Defendants' demand to deed its property to the Defendants for no consideration whatsoever.

43.     Despite the Defendants' refusal to respond to the information provided on Gleeson, Packard Square took the affirmative step to replace Quandel with Gleeson on October 17, 2016.  In the schedule provided to Goldman and Scholz on September 30, 2016, Gleeson had then scheduled completion of the project in under six months – that is, by March 2017.  With Quandel out of the picture, the project was proceeding effectively under Gleeson.  The completion of the project by Gleeson and Packard Square by March 2017 would, if the Defendants did not interfere, have thwarted their long-planned objective of seizing the substantial equity in the Packard Square project for themselves.  Completing the project by March 2017 was within the 150-day extension allowed by the force majeure provision in the October 2014 Loan Documents.  Thus, without taking into account the Defendants' many intentionally caused delays and failures to fully fund construction draws (while still charging interest on the unreleased funds), the project was scheduled to be completed on time as provided for in the October 2014 Loan Documents.

44.     On or about October 19 and 20, 2016, at the Defendants' offices in New York and Los Angeles, Scholz was collecting market data for the Defendants and enthusiastically sharing with Page, Goldman and Stamolis in multiple emails that "Ann Arbor is currently the #1 strongest submarket" for apartments in the entire United States, that rents had increased 23% since the loan origination, and that the Packard Square project was projected, upon completion, to be worth $98.6 million.  Yet at the time, the Defendants had funded only approximately $33 million to Packard Square.

45.     On or about October 20, 2016, Schubiner met with Stamolis and Goldman in Los

Angeles at which time they demanded baselessly that Packard Square inject more money into the project. When Schubiner asked to see their calculations and to use the $2,650,000 designated in the October 2014 Loan Documents for the purchase of the site adjacent to the project, the Defendants refused to document the need for any new funds and refused to allow any use whatsoever of the $2,650,000 even though Page had emailed on September 24, 2014 specifically stating that these funds could be used for cost overruns, and even in light of the fact that the Defendants had been charging Packard Square 16% default interest on these funds, along with an additional $18,000,000, since August 26, 2016.

**IV.    The Defendants' Scheme to Defraud by Assuming Control of Packard Square through the Appointment of a Receiver**

**A.    The Defendants' Scheme to Defraud through False Statements to the State Court at the October 2016 Hearing to Obtain the Appointment of a Receiver**

46.    On or about October 21, 2016 – the day after the Los Angeles meeting, which was never planned as a bona fide business meeting but rather as a deceptive cross-country diversion for  Schubiner – the Defendants accelerated the $53.7 million loan, called it immediately due and payable, and filed a complaint for judicial foreclosure and an *ex parte* "emergency" motion for the appointment of a "Receiver" for the Packard Square project and Packard Square itself in the Michigan Circuit Court (the "State Court"), *CAN IV Packard Square LLC* v. *Packard Square LLC, et al.*, Case No. 16-990-CB (the "Michigan Lawsuit").  In the course of that proceeding, the Defendants were able to have a receiver appointed to assume control of the property based on false, fictitious and fraudulent representations to the State Court - less than 72 hours after the service of the complaint and motion for the appointment of a receiver and without any evidentiary hearing.

47.    The Defendants' pattern of lies, misrepresentations and falsehoods presented to the State Court, which later emerged through limited discovery following the October 2016

Hearing (and which were not part of the record then available for appeal of the initial order appointing the Receiver), were extensive and were as follows:

**a.   The Winterization Lies Designed to Create the Illusion of an Emergency**

48.     In their initial pleadings on October 21, 2016, the Defendants fabricated a fictionalized emergency that Packard Square failed to maintain the property in a good and safe condition for the winter and that harm was imminent.  At no prior time had the Defendants sent a demand notice with a list of urgent "winterization" items.  As a matter of custom in the industry, a legitimate lender with real concerns would have first contacted the developer and demanded that a detailed list of so-called urgent 'winterization' items be completed by a date certain.  The falsity of this emergency was proven on May 4, 2018, more than a year and a half later, when Packard Square deposed Goldman, the Managing Director of the Defendant Canyon Partners Real Estate.  Goldman not only admitted the term "winterize" is nowhere in the loan agreement, which was one of the October 2014 Loan Documents, but also admitted that no one ever told him "what the items were that were necessary before the building would be allegedly damaged."

**b.   The "Game Plan" Lie**

49.     The Defendants caused to be falsely and repeatedly asserted in open court that McKinley, Inc., the Defendants' proposed developer of Packard Square's property, and Matthew Mason, a former employee of McKinley as the Defendants' proposed Receiver by stating that they "have a game plan already set forth of taking over this project and bringing it to completion very quickly . . ."  Nearly seventeen (17) months later, Packard Square learned through the limited discovery it had received from the Defendants in a crucial email sent on October 26, 2016, the day before the October 2016 Hearing, which outlined the actual plan to suspend the project in full for the winter and only "begin construction in earnest once the frost laws are lifted," which generally occurs in Michigan in March or April each spring, approximately six (6)

months after the Defendants' false representation that that it had a "game plan" to bring the project "to completion very quickly."  There was no legitimate reason to suspend all construction during the winter since construction had been approximately 60% completed, and construction on nearly all aspects of the project could have continued during the winter months without violating the frost laws, which come on and off for roughly a month in the late winter or early spring of each year.  The Michigan frost laws were no excuse to delay construction, since the laws only apply to the use of very heavy truck equipment that potentially could damage public roadways in the late winter and early spring of each year.  As of October 2016, there was no legitimate reason not to continue immediately with all aspect of the exterior and interior construction.

    **c.  The "Disrepair Lie"**

    50.     The Defendants also caused to be asserted at the initial State Court hearing that the project was in "jeopardy of going through the winter in a state of disrepair" and that the Defendants possessed both an allegedly credible report and declaration from their consultant, Van Curen, the Defendants' former employee who was the principal of HG Assessment Corp. Defendants instructed Van Curen to take the blatantly false positions (i) that Packard Square was failing to take adequate pre-winter precautions for the 2016-2017 winter season, and (ii) that severe winter harm to the project was imminent. The Defendants prepared Van Curen's Declaration that falsely claimed imminent harm and danger to the project, and on October 20, 2016, the day before the State Action was filed, Stamolis deemed the immediate preparation of the Van Curen Declaration as "mission critical."

    51.     The falsity of the statements of the Van Curen Declaration is proven by the April 16, 2018 deposition testimony of Van Curen that McKinley and Mason had not completed the so-called "winterization" items even after the 2016-2017 winter and that most of the items had

still *not* been installed by McKinley and Mason as Receiver before the following 2017-2018

winter.  The Defendants caused this admission to be confirmed in the answers to Requests for

Admissions in January of 2018.  Plainly, the Defendants knew they had lied when they caused it

to be claimed on October 27, 2016, in State Court pleadings, that Packard Square had created

"imminent harm."

### d.  The "Degradation Lies"

52.    At the October 2016 Hearing, the Defendants relied upon the Van Curen

Declaration to falsely state that, under Packard Square's watch, construction had entirely

stopped.  More specifically, the Declaration asserted that, "[a]bsent immediate recommencement

of construction and winterization of the construction site, the condition of the [b]uilding will

degrade, deteriorate, and depreciate . . ."   In truth and in fact, Packard Square had never, since

the Defendants finally approved the notice of commencement at the end of 2014, stopped

construction of the project while under Packard Square's control.  The term "recommencement"

was used to create the false impression that construction had stopped.  At her April 16, 2018

deposition testimony, Van Curen testified that she had no knowledge that the construction had

stopped.  To the contrary, she admitted that at the time of her one and only site visit on

September 15, 2016 – before the October 2016 Hearing – Packard Square was merely a 60-65%

complete building in the midst of construction: "It was a construction site ongoing," testified

Van Curen.  "… I'm not saying there was a problem.  I was indicating that the utilities and

mechanical systems were incomplete."  Her testimony was consistent with the Newbanks report

of the exact same date alleged above that there were no "visually apparent unaddressed

deficiencies," and the "overall quality of the work . . . appeared to be in general conformance

with industry standards and the intent of the construction plans & specifications.".

**e.   The Lies about McKinley's and the Proposed Receiver's Expertise**

53.     The Defendants falsely caused to be stated at the October 2016 Hearing that

McKinley, together with Mason, who would be the Receiver, was "a very experienced local

knowledgeable excellent company that could come in" to complete construction.  On or about

September 20, 2017, nearly a year after the hearing, Mason as Receiver testified in subsequent

Bankruptcy Court proceedings that his "expertise is not construction."

54.     At the October 2016 Hearing the Defendants also caused the following statement

to be made about the proposed Receiver by Receiver's counsel: "This is exactly the kind of

project that my client has experience with.  They [McKinley and Mason] know how to take a

faltering project and turn it around.  They're known as turn-around experts.  They don't delay

things."  That this statement was a lie was later revealed in proceedings on January 10, 2018, at a

hearing in the Michigan Court of Appeals.  In an effort to rebut Packard Square's position that

McKinley had disqualifying conflicts-of-interest to act as a Receiver because it was an owner

and manager of many existing nearby properties and not a developer like Packard Square, the

Defendants' counsel asserted that McKinley was not in the same business as Packard Square.

Describing McKinley and Mason, the Defendants' counsel conceded that McKinley was a

manager of existing properties and not a developer, "[N]ot when it comes to ground up

construction and development projects" on the "scale" of Packard Square, "that's for certain."

**f.   The Lie about Packard Square's Responsibility for Liens**

55.     At the October 2016 Hearing the Defendants concocted the falsehood that

Packard Square had been "squabbling with his contractor to the point where construction liens

are filed."  The two liens in question amounted to approximately $1.2 million.  Even though

Packard Square was entitled from the October 2014 Loan Documents to funds from the

Defendants to pay these contractors and had specifically requested as early as August 31, 2016

that these contractors be paid, and even though Scholz and Van Curen approved the payments, and the Defendants had been charging interest on this money for months, the Defendants purposely and corruptly held off paying these subcontractors to maintain those liens fraudulently against Packard Square in the October 2016 Hearing to justify the appointment of a Receiver, even though they had caused these liens to be filed against the property.

### g.   The Lies Regarding McKinley's Aggressive Schedule

56.     At the October 2016 Hearing the Defendants falsely represented that "McKinley . . . has a construction schedule that is very aggressive, very on point that will get the project done in a timely fashion and get it leased up."  Both Van Curen, in her deposition two years later on April 16, 2008, and Kevin Scholz, the Defendants' Vice-President of Asset Management, in a Bankruptcy Court hearing on September 19, 2017, approximately a year after the October 2016 Hearing, testified that in fact there was no overall "schedule" until 9 to 10 months after the October 2016 Hearing - thus evidencing the falsity of the Defendants' on-the-record statements at the initial October 2016 Hearing, and that the Defendants' true schedule was and is to consume more than two full years to complete a project that could have been completed by Gleeson and Packard Square within six (6) months after October 2016.

### h.   The Lies about the Retention of Gleeson

57.     The Defendants caused their counsel to falsely represent at the October 27, 2016 Hearing that they would consider continuing the construction management by Gleeson to complete the project as quickly as possible: "We're here because we want the property completed, leased, up and generating income . . . I wasn't saying we're telling McKinley who to hire, just that they would consider all options including Gleeson, whatever would take the project forward as quickly as possible."  The lie to this statement is proven by an email from Mason to Goldman (received in discovery nearly 18 months later) that was sent three days before the

October 2016 Hearing on October 24, 2016, in which the Defendants concluded that the selection of O'Brien as the general contractor to replace Gleeson was "completed" and that O'Brien was the "cornerstone to our success."  Similarly, Mason, as Receiver, perpetuated this same lie in an affidavit (prepared jointly with the Defendants as reflected in an email of August 24, 2017, from the Defendants' counsel to Goldman, Scholz and Mason) to the federal Bankruptcy Court by swearing on September 7, 2017, that Gleeson was not chosen to continue as general contractor until "after careful vetting" of Gleeson, when, in fact, Mason never had any communication with Gleeson, and his first act on his first day as Receiver was to bring O'Brien to the Packard Square project and terminate Gleeson.

58.     At the conclusion of the October 2016 Hearing, the State Court, which allowed no testimony and relied exclusively on the misrepresentations in the Defendants' moving papers and oral misrepresentations by counsel for Defendants and the Receiver, appointed, as the Defendants had demanded, McKinley as Receiver of the Packard Square project; and Mason, an unqualified employee of McKinley, was specifically designated as "Receiver" with complete and unfettered authority over the project, including all of its claims, control over marketing, leasing, management and all of Packard Square's other developer roles including provisions in the State Court order ("Order Appointing Receiver") to sell the Packard Square project even before a full adjudication of Packard Square's affirmative defenses and counter-claims.

**B.     The Defendants' Scheme to Defraud by Manipulating the Receiver to Build Slowly While Charging Exorbitant Interest and Costs to Packard Square to Capture as Quickly as Possible Its Equity in the Project**

59.     Simultaneously with filing the Michigan Lawsuit, the Defendants swept $20 million from Packard Square's construction reserve account and, after the Receiver was appointed, loaned those same funds to the Receiver at 16% (instead of Packard Square's promissory note rate of 10%) and then charged duplicative loan fees and costs on the new super-

priority Receiver Loan (the "Receiver Loan").

60.     In direct contrast to the onerous October 2014 Loan Documents, the intentionally lax terms of the Receiver Loan were drafted to make it nearly impossible for the Receiver to default while ensuring severely detrimental consequences to Packard Square.  A super-priority loan could have been obtained for a very low interest rate but, consistent with the Defendants' long-term campaign to steal the tens of millions of dollars of Packard Square's equity, the Receiver and the Defendants never attempted to secure a lower rate loan since that would have impaired their scheme to seize Packard Square's equity as quickly as possible.  The Receiver Loan also made it difficult, if not impossible, for Packard Square to repay the loan because the Receiver Loan documents contained no language, which allowed Packard Square to pay off the loan.

61.     Over the course of the more than nineteen (19) months since the Receiver's abrupt and unjustified appointment – allegedly for the purpose of completing the project virtually immediately and faster than Packard Square– the Defendants have purposefully caused the Packard Square project not to be completed.  In direct contravention to the Defendants' representations to the State Court that the Receiver had a schedule and would effectuate speedy construction progress, the Defendants' pre-meditated plan was to stop construction altogether for the 2016-17 winter and had no schedule at all for completing construction.

62.     The guise of the Order Appointing Receiver was deviously manipulated to move construction forward very slowly and without consequences in a complete reversal of the overly stringent controls, schedules, milestone requirements, liquidated damage provisions, bonding requirements, among other tight controls, mandated in the October 2014 Loan Documents.  In fact, the Defendants intentionally have held the Receiver and O'Brien to no standards at all.  The

Defendants' directions to the Receiver demonstrate they had no legitimate concern regarding the milestone dates in the October 2014 Loan Documents as moving construction forward at a slow pace has been perfectly acceptable to the Defendants.

63.     In direct contrast to the Defendants' trigger-finger approach to place Packard Square in default as early and as often as could be fabricated, the Defendants hold the Receiver to no budgetary constraints and plainly encouraged the Receiver to proceed at a small fraction of the rate of the Gleeson schedule.  Specifically, (i) the Receiver provided no overall schedule for the first nine (9) months when the Receivership Loan required the schedule in ninety (90) days' (ii) the Receiver provided no supporting bids or documentation with the $25 million construction contract with O'Brien, and there was even no required timeframe to enter into the construction contract; (iii) there were no repercussions whatsoever for the Receiver's August of 2017 unconscionable cost overrun of nearly $18 million as opposed to the strict "*Construction Loan-In-Balance*" provision required of Packard Square; (iv) in direct contrast to the $5,000.00 daily penalty that the Defendants required in the prior Quandel contract, O'Brien faces no liquidated damage penalties for delays; (v) the Defendants have never issued default letters to the Receiver, even when the Receiver defaults under the ultra-sympathetic Receiver Loan and the Order Appointing Receiver; (vi) the Defendants have imposed no interim, substantial, or final completion milestones on the Receiver or O'Brien; (vii) the Receiver has been required to carry only a nominal $20,000.00 bond *and* no bond has been required of O'Brien, as contrasted to the $32 million bond the Defendants obligated Packard Square's contractor to post; (viii) the Receiver and the Defendants have imposed no penalties or other financial sanctions for lateness by O'Brien since there is no required completion date at all; and (ix) Scholz, testified in his deposition on May 2, 2018 that he is not aware of another time that the Defendants from the

outset with a regular borrower ever entered into such an agreement with no milestone dates, no penalties and no bond.  He further testified that the Receiver Loan "*probably has the highest project returns*" of all of the Defendants' loans.

64.     Performing construction slowly, which translates to stealing Packard Square's equity quickly, is articulated in contracts the Defendants' approved with third parties.  McKinley had secretly executed an agreement, far outside of the intents and purposes of the Order Appointing Receiver, with O'Brien to move construction forward extremely slowly and fraudulently.  On or about April 25, 2017, the CEO of McKinley, Albert Berriz signed an agreement with O'Brien (the "Berriz Amendment") which set a completion date of October 2018, two years after McKinley and Mason were appointed Receiver.  This two-year timeframe, which has since been delayed further, is stunning since, at the time the Receiver and O'Brien took over complete control on November 1, 2016, the building was already 60% to 65% complete, and Gleeson had explicitly undertaken to finish the project within six (6) months of October 2016.

65.     With only 35% to 40% of the work remaining on the project as of the time the Receiver was appointed, the Defendants contrived to require the charging of exorbitant interest and fees to Packard Square for as long as possible by slowing the work to the maximum extent. The agreement that Berriz signed (and which the Defendants approved) divided O'Brien's work into three exceptionally slow phases that the Receiver and O'Brien acknowledged in an amended agreement of April 25, 2017, "…may reduce or eliminate efficient and economical implementation of the Work which may increase the Contract Sum and Contract Time generally typical to industry standards."

66.     The Berriz Amendment clearly articulates the scheme to dole out funds in slow,

small tranches, which increases the contract sum and contract time and which reduces or eliminates efficient and economical implementation of the "Work."

67.    In fact, despite the Defendants' explicit representations at the October 2016 Hearing that the appointment of McKinley and Mason would dramatically expedite the project's completion, not a single apartment had received a certificate of occupancy, and no leases for the retail spaces had been executed or even attempted by the Defendants, as admitted to by Van Curen at her deposition on April 16, 2018.  The Receiver and the Defendants have purposefully ignored all retail leasing opportunities, including multiple valuable leases procured by Packard Square, which were on the verge of execution at the outset of the receivership, despite the Defendants' arguing to the State Court at the October 2016 Hearing that it was essential that McKinley and Mason take over all developer roles – even when there were no allegations whatsoever regarding leasing, marketing, management, design, tax increment financing, environmental, engineering, and nearly all of Packard Square's duties as developer.  Ignoring the retail leasing has severely compromised the value of the Packard Square project as: i) leased retail space is substantially more valuable than vacant space as there is a predictable income stream in place after being leased successfully; and, ii) increased rents can be garnered from prospective residential tenants when there are known retail amenities in the first floor of the building; conversely, when the retailers are unknown and the retail space is deliberately vacant, the achievable apartment rents are lower, the pace of lease-up of the 249 apartment units is slower, and in turn, significant rental income is lost.  As a result, the lower rental income stream materially compromises the property value.  The Defendants had no good faith basis to remove Packard Square from its developer roles, and as learned 18 months after the October 2016 Hearing, Goldman, on behalf of Canyon Partners Real Estate, had sent an internal email on

September 1, 2016, the month before the October 2016 Hearing, stating that he "really likes [Packard Square's management and leasing] person on the asset."

68.     This intentional failure of promised progress during the receivership has had, and will continue to have, dramatically adverse consequences for Packard Square.  The motivation and context for this on-going damage is clear, since in common industry practice, a legitimate lender – which the Defendants blatantly are not – would have acted to remove this Receiver for the Receiver's lack of progress.  It is patently obvious that the Defendants by their inaction have mandated the intentionally slow rate of construction.

69.     Slow construction is the core motive of the Defendants' scheme to force Packard Square to accrue interest at the exorbitant rate of 16% until its equity is fully stolen.  The deliberately slow construction has also enabled the Defendants not only to deplete Packard Square's equity through the growth of exorbitant interest charges but also through the assessment of millions of dollars of late fees, lawyers' fees, other "professional" fees, and additional exorbitant charges on Packard Square.  The Defendants regularly pay to McKinley and Mason amounts far in excess of what is provided for in the Order Appointing Receiver and have not even insisted that the Receiver competitively bid work in order to control construction costs because they assume Packard Square will be forced to pay all of these excessive costs.

70.     Rather than move "very aggressively" with a schedule "very on point," as the Defendants misrepresented at the October 2016 Hearing, the Defendants in fact have done what Mason and Goldman secretly agreed in an email sent one day before the October 2016 Hearing in which Mason wrote that they would not "begin construction in earnest until the frost laws are lifted."  See paragraph 49 above.  As alleged above, there was no valid reason to stop construction until sometime between mid-March and mid-April 2017 because of the frost laws.

Nonetheless, the Defendants, once they caused the instant granting of the Receivership by the State Court, immediately supported suspension of construction in full.  This fact was, as previously alleged, later confirmed by Van Curen when she testified at her deposition on April 16, 2018, that work on the building envelope, mechanical, electrical, fire suppression, insulation and drywall completely stopped in the six months after the Receiver's appointment.  Yet, on October 20, 2016, the day before the Defendants caused the filing of the Michigan Lawsuit requesting a Receiver to be appointed, Van Curen sent an email to Scholz in which she projected that the MEP [mechanical, electrical, plumbing] Rough-Ins would be completed in January 2017. As of the date of the filing of this complaint, this work has still not been completed, as per the Receiver's June 20, 2018 report.  This stoppage is also corroborated by the later-discovered facts within the Receiver's bank statements and construction records which reveal little or no construction expenditures for at least six (6) months, as well as the delayed signing of subcontracts until 6 to12 months after the Receiver's appointment.  To put this in perspective, the Defendants caused the suspension of work until well after Gleeson, the contractor the Defendants replaced with O'Brien, promised to finish the entire project.

71.     The Receiver and the Defendants also agreed to pay O'Brien an exorbitant $27.1 million to complete the last approximately 35-40% of the work *and* to do so without any legitimate risk in stark contrast to the requirement in Quandel's GMP [guaranteed maximum price] contract for $32.3 million to construct the entire project, $5000.00 of daily liquidated damages for late delivery, *and* a performance bond for $32.3 million.  The Receiver and the Defendants had no concern about grossly over-paying O'Brien because all contract costs are shifted to Packard Square, while at all times the Defendants' 16% interest charges to Packard Square accrue on these inflated costs on a super-priority basis.

- 31 -

72.     The Defendants, rather than insist on the continuation of Gleeson as the general contractor, approved the installation of O'Brien as general contractor before the receivership began, even though Gleeson had an experienced team on-site, was oriented extensively with vast knowledge about the project, and had the capability to quickly move forward given its strong relationships with the existing subcontractors.  To exacerbate delays, the Receiver, at the behest of the Defendants, has refused to have any contact with Packard Square – which is, after all, the owner/developer of the project – or the architectural and engineering firm which designed the building or anyone else familiar with the status or details of the $20 million of construction work that was already in place.  The reason the Defendants did not direct the Receiver to consult with the project architect is because he would have told them that the "winterizing" allegation used to install a Receiver in 2016 was invalid.  He would have told them that it is inexcusable that the Receiver has failed in a year's time to complete the very items it argued were urgent and necessitated a receiver in October of 2016, and that the entire building would have been completed by June of 2017 at the latest had Packard Square been left in control of the project, that the Receiver has accomplished very little in a year, and that the Receiver is negligently behind any commercially reasonable schedule for a project of this magnitude especially given the status of the construction at the time the receivership began.

73.     Immediately after the Receiver's appointment, the Defendants caused the halting of the leasing efforts altogether in direct contradiction of the Defendants' representation at the October 2016 Hearing that the Receiver "will get this project done in a timely fashion and get it leased up."

74.     To the contrary, after the October 2016 Hearing the Defendants caused the immediate closing of the project's state-of-the-art leasing center and termination of  Packard

Square's leasing and management agreement with Pinnacle, including the firm's manager that

Goldman stated internally a month earlier that he "really like[s]" and that the Defendants

described in its draft pre-loan document as "…one of the national leaders… clients include more

than 235 institutions, pension funds, private partnerships, foreign investors, sole owners and

government housing groups."  After terminating this nationally renowned leasing and

management firm's staff, the Defendants caused the padlocking of the doors of the state-of-the

art leasing center, removal of the project's 400-foot long marketing sign, deletion of the project's

custom website, the unnecessary cancellation of dozens of reservations and return of those

apartment deposits.

75.    On the initial day of the receivership on November 2, 2017, just as Mason and

Goldman secretly agreed one week earlier, McKinley and O'Brien demanded that all of Packard

Square's subcontractors leave the site.  Over six months later when the Defendants began to re-

start construction, the Receiver hired back many of the same subcontractors but often at vastly

increased sums to reimburse them for the stops and starts caused by the Defendants.

**C.     The Defendants' Scheme to Defraud Packard Square by Precluding Packard
         Square from Assuming the Construction Contracts Entered into by the
         Receiver**

76.    The construction contracts between the Receiver and O'Brien (approved by the

Defendant Canyon Partners Real Estate and signed on or about March 1 and July 1, 2017) were

designed to preclude Packard Square's ability to assume the contracts despite the fact that under

Michigan law the Receiver is obligated to act in the best interest of Packard Square.  In

derogation of the Receiver's legal duty to act in the best interests of Packard Square, the

Receiver-O'Brien contracts provide: "Neither the Receiver nor [O'Brien] shall assign the

Agreement . . . except that the Receiver may assign the Agreement to a lender providing

financing to the project [that] is not [Packard Square] . . ."

77.     Like the Receiver-O'Brien contracts, the more than fifty O'Brien subcontracts (also approved by the Defendants and executed primarily in mid-to-late 2017) contain provisions which were part of the Defendants' fraudulent scheme to steal Packard Square's equity in its property.  More specifically, the subcontracts approved and funded by the Defendants and their entities state in their Assignment, Termination and Default language: "The subcontractor further acknowledges and agrees to permit assignment of this Agreement, without written consent, should such assignment be to [an affiliate of the Defendants] . . . to the Receiver, to an entity formed either jointly or severally by the [affiliate of the Defendants] and Receiver, to a lender of [affiliate of the Defendants] and/or Receiver . . ."  This assignment language should have been for the benefit of Packard Square at the conclusion of the receivership, and certainly not a joint venture of the Defendants and McKinley while expressly excluding Packard Square from continuing with the subcontracts once McKinley is terminated.

78.     As a consequence, the Defendants corruptly orchestrated it so that subcontracts could be assigned only to the Defendants, its entities, McKinley or their designees.  This was all in furtherance of the Defendants' scheme to usurp Packard Square's ownership by causing the Receiver to name itself, in concert with an affiliate of the Defendants, rather than Packard Square as the assignee of subcontracts.  Under relevant Michigan law, the assignment language for subcontracts should have been for the benefit of Packard Square, not for the benefit of the Defendants or their affiliates.  The lack of ability to assume subcontracts also negatively impacted refinance efforts.

79.     In furtherance of the above described schemes to defraud through the control gained by the appointment of McKinley and Mason as Receiver, the Defendants caused the following funds to be sent between the Defendants' related entities and the Receiver by

approximate date, sender, recipient and amount of funds through interstate wires to Michigan

from New York and/or California by date and amount of funds:

| Date | Sender | Recipient | Amount |
|------|--------|-----------|--------|
| 11/9/2016 | CAN IV Packard Square LLC | Receiver | $      50,000.00 |
| 11/23/2016 | CAN IV Packard Square LLC | Receiver | $      99,105.02 |
| 12/21/2016 | CAN IV Packard Square LLC | Receiver | $    476,547.80 |
| 1/13/2017 | CAN IV Packard Square LLC | Receiver | $    165,610.59 |
| 1/31/2017 | CAN IV Packard Square LLC | Receiver | $    353,757.69 |
| 2/27/2017 | CAN IV Packard Square LLC | Receiver | $    715,447.70 |
| 3/27/2017 | CAN IV Packard Square LLC | Receiver | $1,440,837.42 |
| 4/24/2017 | CAN IV Packard Square LLC | Receiver | $1,312,079.75 |
| 5/26/2017 | CAN IV Packard Square LLC | Receiver | $    571,099.67 |
| 6/30/2017 | CAN IV Packard Square LLC | Receiver | $1,024,446.14 |
| 7/11/2017 | CAN IV Packard Square LLC | Receiver | $      38,607.99 |
| 7/31/2017 | CAN IV Packard Square LLC | Receiver | $2,665,313.22 |
| 9/5/2017 | CAN IV Packard Square LLC | Receiver | $1,024,836.42 |
| 10/16/2017 | CAN IV Packard Square LLC | Receiver | $1,024,836.42 |
| 10/17/2017 | CAN IV Packard Square LLC | Receiver | $1,818,274.11 |
| 10/17/2017 | CAN IV Packard Square LLC | Receiver | $      79,740.00 |
| 11/21/2017 | CAN IV Packard Square LLC | Receiver | $1,127,904.75 |
| 11/30/2017 | CAN IV Packard Square LLC | Receiver | $    445,304.54 |
| 12/22/2017 | CAN IV Packard Square LLC | Receiver | $1,590,546.78 |
| 1/31/2018 | CAN IV Packard Square LLC | Receiver | $1,779,575.31 |
| 2/28/2018 | CAN IV Packard Square LLC | Receiver | $1,623,244.24 |
| 3/29/2018 | CAN IV Packard Square LLC | Receiver | $2,125,253.06 |
| 4/19/2018 | CAN IV Packard Square LLC | Receiver | $    424,892.00 |
| 4/30/2018 | CAN IV Packard Square LLC | Receiver | $3,420,918.81 |
| 5/31/2018 | CAN IV Packard Square LLC | Receiver | $1,598,676.75 |

**V.     The Defendants' Scheme to Defraud Packard Square by Preventing Packard Square from Refinancing the Defendants' Loans with a Legitimate Lender by Intentionally Refusing to Provide Customary and Timely Payoff Letters and then Deliberately and Fraudulently**

**VI.     Undervaluing the Project to the Bankruptcy Court**

80.     In response to the Defendants' pattern of racketeering activity, set forth above,

Packard Square secured another lender to refinance the Defendants' loans.  The Defendants,

however, refused to provide customary loan payoff letters after a formal request on December 9,

2016.  Packard Square was then forced to file in the State Court a Motion to Compel Canyon and Receiver to Provide Payoff Letters and Accounting.  The order sought in the motion to compel a payoff letter was finally stipulated to in part and memorialized in a State Court Order dated January 6, 2017.  Nearly two months after the initial request for payoff letters, on January 26 and 30, 2017, the Defendant Canyon Partners finally sent through interstate wires payoff letters back-dated to January 24 and 26, 2017, respectively, executed by Plaga as authorized signatory. These payoff letters provided no explanation or customary supporting documentation for the large calculated amounts therein or any justification for the inclusion of legal fees (embedded within multimillion-dollar figures) yet required Packard Square to payoff both of the alleged balances due on the original up to $53.7 million loan and the Receiver Loan the very next day (after receipt of the second required letter) on January 31, 2017 or the payoff letters were rendered null and void.  The Defendants' fraudulent one-day timeframe purposefully made performance impossible as refinance lenders, including Packard Square's proposed new lender, do not make loans for tens of millions of dollars based upon unsupported demands or on less than 24 hours' notice of the alleged loan amounts due.  The Defendants' corrupt object was to prevent Packard Square from repaying the loans so Defendants could continue stealing Packard Square's equity.

81.     For several months after the January 2017 payoff letters were rendered immediately null and void just one day after Packard Square's receipt, the Defendants repeatedly refused to provide credible information for all amounts contained within their payoff letters despite many requests from Packard Square.   Consequently, Defendants refused to discharge their mortgages unless Packard Square paid over $50 million (which grew exorbitantly by unknown and unsubstantiated amounts on a daily basis) that the Defendants refused to support with their accounting records.

82.     Again, on August 1, 2017, Packard Square requested in writing updated payoff letters with "supporting documentation".  Two weeks later, on August 15, 2017, the Defendant Canyon Partners finally sent through interstate wires the requested payoff letters (executed by Kaplan as authorized signatory) but again purposely omitted the requested supporting documentation.  The Defendants' August 15, 2017 payoff letters provided only 72 hours to pay off over $50 million or the "payoff statement[s] will terminate," again knowing full well that Packard Square's performance was logistically impossible in such a short time frame and without the requested supporting documentation.  After more than seven months of the Defendants' refusals to cooperate and provide information and documentation in a customary fashion for payoff of the mortgage loans, Packard Square's refinance lender cited "deal fatigue" and discontinued its efforts to close the refinancing of the project.

83.     As a result, Packard Square had no choice but to file for bankruptcy protection. On or about September 5, 2017, Packard Square filed a petition in the Bankruptcy Court in the Eastern District of Michigan seeking relief under Chapter 11, including approval to borrow up to approximately $22 million from another lender, Ardent Financial, LLP, to enable Packard Square to borrow the funds to complete construction and cover other ancillary costs of the project.

84.     On October 13, 2017, the Bankruptcy Court dismissed Packard Square's bankruptcy petition because, as the Bankruptcy Court held, "the most important factor in this case, which overwhelms all other factors, is that the Court has denied the Debtor's DIP [Debtor in Possession] Financing Motion" with Ardent Financial.  The Bankruptcy Court denied that financing motion because it held there was not adequate protection for the creditors.  The Bankruptcy Court held that the value of the Packard Square property was not substantially

greater than the total of all debts secured by all liens on the property and therefore an adequate equity cushion would not exist with the addition of the proposed priming lien for the $22 million DIP loan.

85.     In violation of Title 18, U.S.C. § 152, on or about September 19, 2017, the Defendants corruptly caused their so-called expert to make false oaths before the Bankruptcy Court ("September Bankruptcy Hearing") that resulted in a value to the property that approximately equaled the sum of the alleged existing loan balances, the alleged lien balances and the proposed DIP loan.  The Defendants' material lies presented to the Bankruptcy Court resulted in a completion value of $81,900,000 or less.  The completion value of the project was manipulated to be nearly identical to $81,625,346.49, the sum of the Defendants' alleged (and overstated) existing liens and the proposed DIP loan.  However, in truth and in fact, the Defendants in an internal email from Scholz, dated October 16, 2016 ("the October 16 Email") produced in discovery approximately 6 months after the September Bankruptcy Hearing, valued the net income for the completed project as $5,876.098, resulting in a completion value of $98,644,966 for the project, as Scholz also confirmed in his later deposition of May 2, 2018, a completion value substantially higher than the sum of the alleged existing liens and the proposed loan.  Accordingly, the Defendants' knowing use of this and other false testimony resulted in an understatement of the value of the project by over 20% and in the Bankruptcy Court not approving of the loan to prime the Defendants' loans, and the court's dismissal of Packard Square's bankruptcy petition.

86.     In addition to the false testimony of the Defendants' expert, the Defendants provided other false statements and testimony to the Bankruptcy Court that further undermined the equity cushion and supported their fraudulent goal of demonstrating a lack of an adequate

equity cushion and upon which the court relied to deny the DIP Financing Motion and dismiss the action as set forth below:

a. On September 13, 2017, the Defendants caused their counsel to lie by saying legal fees are excluded from the Defendants' July 31, 2017 loan balances, when in truth and in fact, over a million dollars of legal fees were included as part of the loan balances. The Defendants' counsel falsely stated, "It's important to know the Court hasn't decided that any attorney fees can actually be added to the debt. That issue is still up, and the Court has not decided that." Yet, the Defendants caused it to be admitted in Requests to Admit on January 17, 2018 that there were attorney fees embedded within the $38,117,319.33, July 31, 2017 principal balance. This lie materially understated further the equity cushion by over a million dollars.

b. On September 13, 2017, Scholz lied in his testimony in the Bankruptcy Court that there were then "$9,000,000 worth of liens" on the project, which included "5.9 million dollars from Quandel." The $5.9 million Quandel lien included amounts for subcontractor liens. Scholz and the Defendants knew that the $5.9 million figure should have been reduced by nearly $2 million for amounts already paid pursuant to the Defendants' prior approval of Settlement Agreements and lien discharge payments to subcontractors including: Construction Ahead, Jermor Plumbing, Sharon's Heating, Evergreen Civil, Michigan Woodwork, RAM, D&V Excavating, JSC Roofing, and Masonry Developers. Moreover, there is reason to believe that Scholz and the Defendants knew that the amount Scholz testified was owed to Quandel was further overstated, thereby corrupting further the United States Bankruptcy Court's equity cushion calculations.

## VII.  Damages

87.    As a direct and proximate result of the Defendants' pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), Packard Square has been injured in its business and property as described above.

WHEREFORE, Packard Square demands judgment against the Defendants, jointly and severally, and in its favor for:

A.  Compensatory and other damages contemplated by and available through 18 U.S.C. § 1964(c) for damages actually sustained in the amount of at least $100,000,000;

B.  Threefold the actual damages sustained;

C.  The costs of suit and reasonable attorneys' fees; and

D.  Such other relief as the Court deems just.

## COUNT II

## RICO VIOLATIONS OF § 1962(d)

88.    Packard Square realleges and incorporates herein by this reference the allegations in paragraphs 1 through 87, as if set forth fully herein.

89.    From in or about September 1, 2014 to the present, the Defendants, together with others known and unknown, unlawfully, willfully, and knowingly conspired, combined and agreed to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprise pleaded in paragraphs 8 through 10 above, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

90.    In furtherance of this conspiracy the Defendants and others, known and unknown to the Packard Square, committed numerous overt acts as alleged above in the pattern of

racketeering in paragraphs 11 through 87.

91.     As a direct and proximate result of the Defendants' wrongful actions described

herein, Packard Square has sustained actual damages as described above.

WHEREFORE, Packard Square demands judgment against the Defendants, jointly and

severally and in its favor for:

A.  Compensatory and other damages contemplated by and available through 18

U.S.C. § 1964(c) for damages actually sustained in the amount of at least

$100,000,000;

B.  Threefold the actual damages sustained;

C.  The costs of suit and reasonable attorneys' fees; and

D.  Such other relief as the Court deems just.

## COUNT III

## CONVERSION

92.     Packard Square realleges and incorporates herein by this reference the allegations

in paragraphs 1 through 92, as if fully set forth herein.

93.     This is an action against the Defendants for their joining, collective and

independent actions to unlawfully convert property and funds belonging to Packard Square.

94.     Despite Packard Square's ownership of its property and funds, the Defendants

knowingly, dishonestly, and intentionally defrauded and stole money and funds belonging to

Packard Square.

95.     The Defendants' actions constitute a knowing, unlawful, and intentional

conversion of Packard Square's property and funds.

96.     As a direct and proximate result of the Defendants' wrongful actions described

herein, Packard Square has sustained actual damages as described above.

WHEREFORE, Packard Square demands judgment against the Defendants, jointly and severally, and in its favor for:

    A.  Compensatory and other damages contemplated for damages actually sustained in the amount of at least $100,000,000;

    B.  Punitive damages; and

    C.  Such other relief as the Court deems just.

## COUNT IV

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

97.    Packard Square realleges and incorporates herein by this reference the allegations in paragraphs 1 through 97, as if fully set forth herein.

98.    Under Michigan law the Receiver, McKinley, has a fiduciary duty to all persons claiming interests in the Packard Square property and is obligated to exercise his office with the utmost good faith and loyalty, including a duty of candor, competence, loyalty, and a duty not to favor the Defendants over Packard Square and its creditors.

99.    In violation of that duty, the Defendants secretly, corruptly and systematically embarked upon a scheme to compromise the Receiver and aided and abetted the Receiver in violating its fiduciary duty to Packard Square and treating Packard Square as an adversary and the Defendants as their partners.

100.    Multiple examples of this illicit "partnership" between the Defendants and the Receiver have been revealed only by the limited discovery thus far provided to Packard Square including, among other things:

a.      On or about August 24, 2017, Defendants' counsel emailed Goldman, Scholz and Mason, the representatives of the Receiver, and others to arrange a collective conference call "to discuss the Packard Square affidavits today," thus confirming the conflicts of interest inherent in having lenders and a putatively neutral Receiver collaborate by jointly preparing affidavits for a court filing in opposition to Packard Square;

b.      On or about September 11, 2017, Mason wrote to Scholz: "I will be with [one of Defendants' lawyers] tomorrow morning for the [bankruptcy] hearing.  If he wants to regroup in the [law firm] offices before the hearing. I will see you then;"

c.      On or about September 12, 2017, a lawyer for the Defendants, preparing for the Bankruptcy Court Hearing the next day, emailed Scholz and Mason regarding "[m]eeting tomorrow before hearing;"

d.      On or about September 13, 2017, Scholz, in an email, prior to the Bankruptcy Court Hearing distributed to others including Mason a link to the "ten best pre-mission songs for combat operations, "together with a note outlining "[b]attle songs from Maria [Stamolis]";

e.      On or about September 18, 2017, Mason emailed Stamolis and Goldman stating, "I will be prepping for the remainder of the day in preparation for a great outcome tomorrow.  As we prepare for tomorrow's important bankruptcy hearing;"

f.      On or about September 18, 2017, further demonstrating the complete alignment between Defendants and the Receiver, Stamolis emailed Mason: "Thanks Matt.

[Mason] Good luck with today's prep and of course with tomorrow. We would love to catch up after . . .;"

g.    On or about December 15, 2017, Goldman emailed Mason, as Receiver, and stated: "Many thanks and we appreciate all of your team's efforts on our behalf," and in that same email chain Mason characterized his and McKinley's relationship with the Defendants as a "partnership;"

h.    On or about May 3, 2017, Mason emailed to the CEO of McKinley, its lawyer and others a celebratory message after the State Court denied two motions filed by Packard Square: "This undefeated streak continues," "I especially like Judge Brown's opinion that Schubiner is merely trying to recycle arguments that were already unsuccessful. Great job, Jim," which email the CEO of McKinley forwarded to Goldman, writing: "FYI . . . . More good news;" and

i.    On or about October 13, 2017, after the Bankruptcy Court dismissed Packard Square's attempt for Chapter 11 re-organization, Goldman emailed McKinley's CEO to inform him of the result, the CEO and one of the associates, responded with emails stating, "Congratulations" and "[t]his is great news."

WHEREFORE, Packard Square demands judgment against the Defendants, jointly and severally, and in its favor for:

A.    Compensatory and other damages contemplated by and available for damages actually sustained in the amount of at least $100,000,000;

B.    Punitive damages; and

C.    Such other relief as the Court deems just.

Dated:   New York, New York                **DORSEY & WHITNEY LLP**
        June 25, 2018

By:   */s/ Nathaniel H. Akerman*
          Nathaniel H. Akerman
          Lanier Saperstein
          Michelle Ng

51 West 52nd Street
New York, New York 10019
(212) 415-9200