UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
------------------------------------------------------x
                                                   :
PACKARD SQUARE LLC,              :        Civil Action No.
                                                   :        2:19-cv-10374-BAF-RSW
                                                   :
              Plaintiff,                        :
                                                   :
        -against-                              :        **SECOND AMENDED**
                                                   :        **COMPLAINT_____**
MITCHELL R. JULIS,                  :
JOSHUA S. FRIEDMAN,          :
MARIA STAMOLIS,                   :
GERALD GOLDMAN,                :
KEVIN SCHOLZ, MARTHA PAGE,  :
CANYON PARTNERS, LLC         :
and                                                :
CANYON PARTNERS REAL ESTATE  :
LLC,                                              :
                                                   :        **TRIAL BY JURY**
                                                   :        **DEMANDED**
              Defendants.                 :
------------------------------------------------------x

# **TABLE OF CONTENTS**

NATURE OF THE ACTION ................................................................. 1

THE PARTIES ................................................................................. 4

JURISDICTION AND VENUE ........................................................... 7

COUNT I  RICO VIOLATIONS OF § 1962(c) ..................................... 8

  I. The Enterprise ........................................................................... 9

    A. Enterprise #1 ...................................................................... 9

    B. Enterprise #2 .................................................................... 12

    C. Enterprise #3 .................................................................... 12

  II.  The Pattern of Racketeering Activity ....................................... 13

  III.  Defendants' Fraudulent Campaign of Unjustified Default
      Notices and Extortion ............................................................. 26

    A. Defendants' Plan from the Outset to Steal Packard Square's Property ... 27

    B. Defendants' Justification for Bogus Default Notices ............... 30

    C. Defendants' Further Actions to Steal Packard Square's Property .......... 46

  IV.  The Defendants' Scheme to Defraud by Assuming Control of
       Packard Square through the Appointment of a Receiver ......... 53

    A. Defendants' Scheme to Defraud through False Statements
       to the Michigan State Court ................................................. 54

      a.  The Lie about Packard Square's Responsibility for Liens ........ 54

      b.  The Winterization Lie Designed to Create the
        Illusion of an Emergency ................................................. 56

      c.  The "Game Plan" Lie ....................................................... 57

      d.  The "Disrepair Lie" ......................................................... 58

      e.  The "Degradation Lie" ..................................................... 60

      f.  The Lie about McKinley's and the Proposed Receiver's Expertise ... 61

      g.  The Lie Regarding McKinley's Aggressive Schedule ............. 62

      h.  The Lie about the Retention of Gleeson ............................. 62

    B. The Defendants' Scheme to Defraud by Manipulating the Receiver ...... 68

C.  The Defendants' Scheme to Defraud Packard Square by
       Precluding Packard Square from Assuming the Construction
       Contracts Entered into by the Receiver ...............................................79

V.  The Defendants' Scheme to Defraud Packard Square by
       Preventing Packard Square from Refinancing the Defendants' Loans ....82

VI.  The Defendants' Fraud on the Bankruptcy Court .........................................84

VII. Damages...........................................................................................................93

COUNT II  RICO VIOLATIONS OF § 1962(d) ...................................................94

COUNT III  FRAUD ................................................................................................95

COUNT IV  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY .....97

COUNT V  UNFAIR BUSINESS PRACTICES, CAL. BUS. &
       PROF. CODE § 17200, *ET SEQ.*....................................................................107

Plaintiff Packard Square LLC ("Packard Square"), by its attorneys Giarmarco, Mullins & Horton, P.C., complaining of Defendants Mitchell R. Julis, Joshua S. Friedman, Maria Stamolis, Gerald Goldman, Kevin Scholz, Martha Page, Canyon Partners, LLC ("Canyon Partners"), and Canyon Partners Real Estate LLC ("Canyon Partners Real Estate"), allege as follows:

## NATURE OF THE ACTION

1.      Packard Square is a small, independent developer of a luxury apartment and high-end retail complex in Ann Arbor, Michigan.  ("Packard Square project" or "project").   Craig Schubiner ("Schubiner"), the manager of Packard Square, envisioned the development after years of careful planning and financial investment. As is typical in development projects, Packard Square needed financing to complete the project.  It therefore obtained a loan of up to $53.7 million from a single-purpose entity, Can IV Packard Square LLC, which is controlled by the Defendants Canyon Partners and Canyon Partners Real Estate.

2.      Evidence which only recently became available reveals that the Defendants did not view the loan as a traditional construction loan.  Rather, the Defendants, along with others known and unknown to Packard Square, weaponized the loan from the very outset so they could use it to seize control of the Packard Square project and steal Packard Square's equity in the project for a fraction of its actual value.

3.     The Defendants have engaged in a criminal scheme over the past four and a half years to defraud Packard Square by, among other things:

    a.  withholding loan funds while extorting money and concessions from Packard Square;

    b.  perpetrating a persistent campaign of default notices based upon bogus non-monetary defaults;

    c.  pressuring Packard Square to sign a deed-in-lieu of foreclosure when no loan payments were ever missed or late;

    d.  fraudulently taking control of the Packard Square project through the appointment of a Receiver by perpetrating numerous lies to a Michigan State Court, and thereafter manipulating the Receiver to slow-down dramatically the construction progress, with the fraudulent goal of letting the Defendants charge exorbitant interest and fees to Packard Square in order to capture as quickly as possible Packard Square's equity in the project;

    e.  precluding Packard Square from assuming the construction contracts entered into by the Receiver;

    f.  preventing Packard Square from refinancing the loan with a legitimate lender by demanding payment of more than $50 million based upon delinquent fraudulently inflated payoff letters, which

2

terms were designed to expire almost immediately after their issuance, as a condition of releasing their liens against the project;

g. vastly overpaying third parties including, but not limited to, the Receiver to gain its loyalty and assistance in perpetrating Defendants' fraudulent objectives, while alleging that Packard Square was responsible for these unconscionable costs;

h. intentionally lying to the United States Bankruptcy Court about the project's value, debt balance and other facts to cause the dismissal of Packard Square's bankruptcy petition;

i. foreclosing on Packard Square's property without any evidentiary hearings or admissible evidence of Packard Square's alleged defaults, while failing to provide most relevant discovery in the foreclosure suit brought by Can IV Packard Square, LLC against Packard Square in Washtenaw County (the "Washtenaw County Lawsuit"); and

j. fraudulently not leasing the project in order to artificially depress the project's value until after Packard Square's redemption rights are extinguished.

4.     This pattern of criminal activity—a deceitful loan-to-own scheme—was not an isolated incident.  Rather, it was part of the Defendants' regular way of

conducting their business, leaving Packard Square, and numerous other victims, in their devious wake.  Indeed, Packard Square and its counsel, through their due diligence efforts, have identified at least ten additional victims of Defendants' scheme.  In schemes with striking similarities—Defendants have a well-thumbed playbook—premeditated to victimize independent developers throughout the country.  As the widow of one victim said, "They [Canyon and its animating participants] steal your money, steal your time, steal your property, and steal your future."

**THE PARTIES**

5.     Plaintiff Packard Square is a limited liability company organized and existing under the laws of Michigan, which principal business is the construction of an apartment and ground floor retail complex in Ann Arbor, Michigan.

6.     Defendant Mitchell R. Julis ("Julis") and the Defendant Joshua S. Friedman ("Friedman") are the co-founders and co-owners of the Defendants Canyon Partners and Canyon Partners Real Estate, as these entities are further particularized below.  Julis and Friedman maintain residences in California, New York and other states.  Defendants Julis and Friedman, jointly with their family limited partnerships and trusts, are the 100% owners of Defendants Canyon Partners and Canyon Partners Real Estate and together controlled all material decisions made by these two limited liability company Defendants.

7.     Defendants Julis and Friedman were the only two continual and long-term members of the Defendants Canyon Partners' and Canyon Partners Real Estate's five-member real estate investment committee—the decisions of which were unvaryingly unanimous.  Defendants Julis and Friedman, through their joint leadership of the real estate group and their roles on the real estate investment committee, controlled all of Defendants Canyon Partners' and Canyon Partners Real Estate's material decisions including approval of all of their loans and investments. As set forth herein, Defendants Julis and Defendant Friedman exercised control over Defendants Canyon Partners and Canyon Partners Real Estate to perpetrate a pattern of racketeering activity against Packard Square and others as part of loan-to-own schemes, whereby purportedly legitimate loans were used to steal borrowers' properties and/or the equity in those properties.  Defendants Julis and Friedman made and controlled major decisions relating to whether to make loans, make changes to pre-closing loan terms; make major changes to loans after closing; act on alleged defaults such as sending bogus default letters and deeds in lieu of foreclosure to Packard Square and other victims; fraudulently accelerating loans; starting lawsuits; commencing foreclosure actions; and installing receivers and crony developers into control of their borrowers' properties.

8.     Document discovery from the Defendants in this case will more fully reveal a criminal playbook honed and perpetrated against Packard Square after more

5

than a decade of perpetrating similar criminal acts on other victims by the Defendants Julis and Friedman.

9.     Defendant Maria Stamolis ("Stamolis") resides in California, is Co-Head of Canyon Partners Real Estate and reports directly to Defendants Julis and Friedman.   Defendant Stamolis is also one of the five real estate investment committee members and has played an influential role in material decisions made by Defendants Canyon Partners and Canyon Partners Real Estate since approximately 2007.

10.     Defendant Gerald Goldman ("Goldman") resides in California, is Managing Director of Canyon Partners Real Estate and reports directly to Defendant Stamolis.   His involvement with Canyon Partners Real Estate began in approximately 2008.

11.     Defendant Kevin Scholz ("Scholz") resides in New York, is Vice-President of Asset Management of Canyon Partners Real Estate and reports directly to Defendant Goldman.   Defendant Kevin Scholz's involvement with Canyon Partners Real Estate began in approximately 2008, while his involvement with regard to Packard Square began in approximately June 2016.   Therefore, wherever "Defendants" are referred to in this Second Amended Complaint, that does not include Scholz with regard to Packard Square until approximately June 2016.

12.     Defendant Martha "Marti" Page ("Page") resides in Colorado, and she

6

was the Director of Acquisitions of Canyon Partners Real Estate and reported initially to Jonathan Roth, as further particularized below, and beginning in approximately September of 2015, reported to Stamolis.  Page's involvement with Canyon Partners Real Estate began in approximately 2001 and ended in late 2016.

13.    Defendant Canyon Partners is a limited liability company organized and existing under the laws of the State of Delaware, with offices in New York and California and which transacts its investment business in New York, California and other states and countries.

14.    Defendant Canyon Partners Real Estate, formerly doing business as Canyon Capital Realty Advisors LLC, is a limited liability company organized and existing under the laws of the State of Delaware, is an affiliated real estate investment arm of the Defendant Canyon Partners with offices in New York and California and transacts business in New York, California and other states.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over the claims for relief arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et. seq.*, pursuant to 18 U.S.C. § 1964(c), has supplemental jurisdiction arising over the claims for relief arising under Michigan law pursuant to 28 U.S.C. § 1367 and has jurisdiction over Defendants Mitchell R. Julis, Joshua S. Friedman, Maria Stamolis, Gerald Goldman, Kevin Scholz, and Martha Page pursuant to M.C.L.

§ 600.705, because they transacted business in Michigan and committed acts of fraud and misrepresentation in Michigan as alleged in this Second Amended Complaint.

16.    Venue is proper in the Eastern District of Michigan pursuant to 18 U.S.C. § 1965(a) because it is a district in which the Defendants transact business and it is the venue in which Defendant Canyon Partners and Defendant Canyon Partners Real Estate requested this case to be transferred after it was originally filed in the Southern District of New York.

## COUNT I

## RICO VIOLATIONS OF § 1962(c)

17.    Packard Square realleges and incorporates herein by this reference the allegations in paragraphs 1 through 16, as if set forth fully herein.

18.    From on or about September 1, 2014, and through the filing of the amended complaint, the Defendants and others known and unknown to Packard Square, who were employed by and associated with the enterprise pleaded in the alternative below, which engaged in and affected interstate and foreign commerce, did unlawfully, willfully, and knowingly conduct and participate, directly and indirectly, in the conduct of the enterprise pleaded in the alternative below through a pattern of racketeering activity, which included acts indictable under 18 U.S.C. § 1341 (relating to mail fraud), § 1343 (relating to wire fraud), § 1951 (relating to

interference with commerce, robbery or extortion), and offenses involving fraud in connection with a case under title 11.

## I.    The Enterprise

19.    Packard Square hereby alleges in the alternative three enterprises, as set forth in paragraphs 20 through 23 below, which are engaged in, or the activities of which affect, interstate or foreign commerce.

### A.    Enterprise #1

20.    During the course of the pattern of racketeering activity between on or about September 1, 2014, and through the filing of this Second Amended Complaint, the Defendants, along with others known and unknown to Packard Square, joined together as a union or group of individuals, associated in fact although not a legal entity, for the common purpose of defrauding and cheating Packard Square out of its equity in its apartment and retail complex in Ann Arbor, Michigan.

21.    The Defendants Julis and Friedman were the ringleaders and organizers of the association-in-fact enterprise, the members of which had specific roles in the enterprise and relationships with the Defendants and among themselves, including the Defendants' officers, employees, and agents and coordinated with each other so as to function as a continuing unit:

   a. Officers and employees of the Defendant Canyon Partners including Defendant Julis and Defendant Friedman, John Plaga ("Plaga"),

Chief Financial Officer of Canyon Partners, Jonathan Kaplan ("Kaplan"), General Counsel of Canyon Partners, all of whom coordinated, directed and approved the criminal activity directed against Packard Square;

b. Officers and employees of the Defendant Canyon Partners Real Estate including Defendant Stamolis; Defendant Goldman; Defendant Scholz; Defendant Page, and Jonathan Roth ("Roth"), former President of Canyon Capital Realty Advisors, the predecessor entity to Canyon Partners Real Estate, all of which individuals coordinated with Canyon Partners in weaponizing the loan against Packard Square;

c. Defendants Stamolis, Goldman, Scholz, Page and others employed by the Defendant Canyon Partners Real Estate generally performed the day-to-day administration of CAN IV Packard Square LLC's loan to Packard Square. They carried out and effectuated the criminal purpose of the association-in-fact enterprise, while the owners and upper management of Canyon Partners, including, but not limited to, Defendants Julis, Friedman, Plaga and Kaplan, made the major decisions with regard to the loan to Packard Square. Defendant Stamolis played an important part in the enterprise, as

she was a member of the real estate investment committee along with Defendant Julis, Defendant Friedman and two others from Canyon Partners Real Estate, Marcus Neupert and Robin Potts;

d. Canpartners Realty Holding Company IV LLC, which provided Packard Square with the loan term sheet;

e. Can IV Packard Square LLC, which has no employees, is directed and controlled by the Defendants and is the single-purpose entity lender of the funds to Packard Square;

f. Entities that invested in and provided the funds for the up to $53.7 million loan to Packard Square, the Receiver Loan, as further particularized below, and loans to other of the Defendants' victims as set forth in paragraphs 30-38 of this Second Amended Complaint, such investors including, but not limited to, Reliance Standard Life Insurance Company and its affiliates, collectively the largest investor in the loans on the Packard Square project, DUMAC Inc. and its affiliates, collectively the second largest investor in the loans on the Packard Square project, and other investors whose identities can only be uncovered through discovery in this matter; and

g. McKinley Inc., which the Defendants fraudulently arranged to be appointed the Receiver of the Packard Square project ("Receiver");

Albert Berriz, the CEO of McKinley, Inc. ("Berriz"); Matthew Mason, the authorized representative and agent of the Receiver ("Mason"), all of which and whom shared in the enterprise's common purpose to assist the Defendants in stealing Packard Square's equity as evidenced by their repeated actions in bad faith and continuing breaches of fiduciary duty owed to Packard Square as alleged further in this Second Amended Complaint.

**B.   Enterprise #2**

22.   Between on or about September 1, 2014, and through the filing of this Second Amended Complaint, Can IV Packard Square LLC is a distinct legal entity and a Delaware limited liability company through which the Defendants conducted or participated, directly or indirectly, in the conduct of the entities' affairs through a pattern of racketeering activity.

**C.   Enterprise #3**

23.   Between in or about September 2006, and up to the filing of this Second Amended Complaint, the Defendants, along with others known and unknown to Packard Square, joined together as a union or group of individuals and entities, associated in fact although not a legal entity, for the common purpose of defrauding and cheating property owners out of their equity in property and development projects.   In addition to the aforementioned Defendants, the association-in-fact

enterprise consisted of the additional distinct entities Canpartners Realty Holding

Company IV, LLC, CJUF II Greenpoint LLC, Can IV Packard Square LLC, Can IV

CT LLC, investors including Reliance Standard Life Insurance Company and its

affiliates, DUMAC Inc. and its affiliates, and other distinct entities presently

unknown to Packard Square.

## II.     The Pattern of Racketeering Activity

24.    It was an object of the pattern of racketeering activity that the

Defendants and others, known and unknown to Packard Square, would devise

schemes and artifices to defraud and to obtain money in violation of the criminal

mail fraud statute, 18 U.S.C. § 1341, and in violation of the criminal wire fraud

statute, 18 U.S.C. § 1343.

25.    It was a further object of the pattern of racketeering activity that the

Defendants and others, known and unknown to Packard Square, obstructed and

affected commerce by extortion by obtaining money and property from Packard

Square with its consent by instilling fear that it would immediately accelerate the

entire loan to Packard Square at an interest rate of 16% in violation of the federal

extortion statute, 18 U.S.C. § 1951.

26.    It was a further object of the pattern of racketeering activity that the

Defendants and others, known and unknown to Packard Square, in response to

Packard Square seeking protection from the federal bankruptcy court did knowingly

and fraudulently make and/or cause to be made false oaths and accounts in relation to the bankruptcy case in violation of Title 18 U.S.C. § 152.

27.    Predicated upon the violations of the above referenced federal criminal statutes, the Defendants, at the direction and control of Defendants Friedman and Julis, knowingly, willfully and intentionally perpetrated a massive fraudulent scheme on Packard Square.  The object of that scheme was to steal Packard Square's assets.  In furtherance of the object of that overall scheme, the Defendants engaged in separate schemes to defraud by:

a.  weaponizing a purported loan of up to approximately $53.7 million by fraudulently withholding loan funds while extorting money and concessions from  Packard Square;

b.  perpetrating a persistent and fraudulent campaign of default notices based upon bogus non-monetary defaults;

c.  pressuring Packard Square to sign a deed-in-lieu of foreclosure when no loan payments were ever missed or late;

d.  fraudulently taking control of the project through the appointment of a Receiver (after Packard Square completed the most difficult parts of the construction project) by: i) false, fictitious and fraudulent statements to the State Court at a hearing in which they obtained the appointment of the Receiver, ii) manipulating the

Receiver to dramatically slow construction of the project to a pace that is a fraction of industry standards so the Defendants could cause exorbitant interest and costs to be charged to Packard Square and capture quickly the equity in the project;

e. precluding Packard Square from assuming construction contracts entered into by the Receiver (even if the subject loan were to be refinanced);

f. preventing Packard Square from refinancing its property with a legitimate lender by demanding payments based upon fraudulently inflated payoff letters as a condition to releasing their liens against the project;

g. vastly overpaying third parties including, but not limited to, the Receiver to gain their loyalty and agreement to help carry out Defendants' fraudulent objectives—while alleging that Packard Square was responsible for these unconscionable costs;

h. intentionally lying to the United States Bankruptcy Court about the project's value and debt balance and other facts to cause the dismissal of Packard Square's bankruptcy petition;

i. foreclosing on Packard Square's property without any evidentiary hearings or admissible evidence of Packard Square's alleged

defaults and while failing to provide most relevant discovery in the

Washtenaw County Lawsuit; and

j.  fraudulently not leasing the project in order to artificially depress
    the project's value until after Packard Square's redemption rights
    are extinguished.

28.     The acts alleged in this Second Amended Complaint are not isolated

events, but are part of the Defendants' regular way of conducting their ostensibly

legitimate business.  The Defendants' pattern of racketeering activity perpetrated

against Packard Square is part of a corrupt "loan-to-own" operation founded, ran and

controlled by Defendants Julis and Friedman and perpetrated against multiple

victims over many years through wire and mail fraud.  The methods and means

alleged in this Second Amended Complaint are similar to acts the Defendants

perpetrated against other victims with similar characteristics including bogus default

notices to place borrowers in default, material misrepresentations to borrowers and

courts, the use of complicit receivers, crony developers and property managers to

gain and exercise control over their borrowers' properties, lying to federal

bankruptcy courts about the value of properties, and other fraudulent means to steal

their victims' equity and/or take ownership of their victims' properties.

29.     Public records, including court documents, and interviews with certain

of the principals of Defendants' other borrowers and documents obtained from these

principals reveal that other properties and independent developers were part of Defendants Julis', Friedman's, Page's, Canyon Partners' and Canyon Partners Real Estate's pattern of racketeering activity based on mail fraud, wire fraud, bankruptcy fraud and extortion beginning in approximately 2006 (with the involvement of Defendants Stamolis, Goldman and Scholz beginning in approximately 2008) through loans encumbering the properties set forth below in paragraphs 30 through 38.

30.   The aforementioned Defendants perpetrated the same or similar fraudulent methods on each of these victims, some of which acceded to Defendants' fraudulent and extortionate demands without litigating, for the same purpose of stealing their properties or the equity therein as set forth below:

   a. ***Vallambrosa Project***.  In or about September 2006, the Defendants Julis, Friedman, Canyon Partners and Canyon Partners Real Estate, through Canpartners Realty Holding Company IV, LLC, caused a loan to be made in the amount of $28 million for a development project known as Vallambrosa in South Chatham County, Georgia. The loan, which was to be used to clear the site and make improvements to the property, had a maturity date on or about March 29, 2008, at which point the parties had contemplated a stage two loan of approximately $60,250,000 for the physical

17

development of the property. Even though the loan agreement had provisions for a six-month extension of the maturity date and even though these Defendants held and/or controlled undisbursed reserves for interest and development costs, on or about April 1, 2008, Roth and Defendants Julis, Friedman, Canyon Partners and Canyon Partners Real Estate caused the developer to be notified that the loan had matured and attempted to extort the developer for an additional 1,600 acres of land as a precondition for their compliance with the extension provisions of the loan documents. When the developer refused to comply with this extortionate offer, the Defendants initiated and ultimately caused the foreclosure on the property after the owner attempted to re-organize in a Chapter 11 bankruptcy proceeding;

b. ***East Coast Fisheries Project***. Beginning in approximately 2006, the Defendants Julis, Friedman, Canyon Partners and Canyon Partners Real Estate perpetrated a scheme on River Drive Partners LLC in Miami-Dade County, Florida that resulted in their foreclosing on the borrower's property in May 2007 in connection with an approximately $16 million loan. As part of its scheme, these Defendants manufactured defaults to force into foreclosure the East

18

Coast Fisheries property, which had been in the Swartz family for generations.  According to the attorney for River Drive Partners LLC, their loan was "death-spiral financing" designed to lead to a property owner's downfall.  In conversations with Rebecca Swartz, the widow of the developer, Ms. Swartz stated regarding the Defendant Canyon Partners Real Estate, "They steal your money, steal your time, steal your property, and steal your future.";

c. ***U.S. Capital/Fashion Mall Project.***  In or about July 2007, Defendants Julis, Friedman, Canyon Partners and Canyon Partners Real Estate, through Canpartners Realty Holdings Co. IV, LLC caused a loan to be made to U.S. Capital Holding LLC for approximately $56 million to build a shopping mall in Broward County, Florida known as U.S. Capital/Fashion Mall.  These Defendants attempted to have a Florida state court appoint a receiver to control the property on the ground that U.S. Capital Holdings LLC allowed the property to deteriorate, even though it was in the same condition as when the loan had been made;

d. ***South Flower Street Project.***  In or about July 2008 the Defendants caused Canpartners Realty Holding Company IV LLC to loan up to approximately $84 million to 845 South Flower Street LLC, the

owner of a 35-story condominium tower in Los Angeles, California.
In an effort to defraud the borrower and steal its equity and/or
property, the Defendants caused it to be falsely claimed in a
bankruptcy proceeding that the borrower had failed to meet
substantial completion milestone dates, when in fact, in or about
September 2009, the borrower had obtained timely from the City of
Los Angeles the requisite Temporary Certificate of Occupancy.  In
furtherance of the Defendants' efforts to steal the project or the
equity, the Defendants impeded both the closing of the sale of
condominium units and repayment of the loan by causing both the
withholding of construction draw payments and refusal to release
lien(s) on the condominium units.  In furtherance of the Defendants
scheme to steal 845 South Flower Street LLC's property and/or the
equity, the Defendants may have made false representations to the
bankruptcy court concerning the value of the condominium units;

e. ***Green Street Development Project.***  An entity controlled by the
Defendants, CJUF Greenpoint, LLC ("CJUF"), had loaned
approximately $12,400,000 to 110 Green Street Development LLC,
a residential redevelopment project.  In an all too familiar pattern,
when the project was forced into bankruptcy, the Debtor stated in

court filings that it had concluded "that by late January of 2009, CJUF adopted a 'battle-ready' position and sought to declare the Debtor in default on a number of trivial and pretextural matters" and "was intent on capturing the inherent potential of the Project for itself."  In March 2009, at the direction of Defendants Julis and Friedman, CJUF sought to dismiss the Debtor's bankruptcy petition. As part of that effort, Defendant Stamolis represented to the bankruptcy court that project was "not even remotely suitable for occupancy" giving the impression to the court "that the Building still requires extensive construction," and that the Debtor remained in default for not meeting the construction completion date.  In fact, Defendant Stamolis knew that the Debtor had obtained a final certificate of occupancy on January 28, 2009.  Also, the Debtor stated that CJUF's "assertion that the Building's purported appraised value has fallen to between $39-44 million" was a lie, since it knew that the Fannie Mae appraisal reflected "a much higher value.";

f. ***Greek Isles Hotel and Casino Project.***  In or about August 2009, the Defendants, at the direction and control of Defendants Julis and Friedman, caused an approximately $56 million loan from

21

Canpartners Realty Holding Company IV, LLC to be made to the Greek Isles Hotel and Casino.  The majority owner of the Greek Isles Hotel and Casino, according to press reports, is quoted blaming "'greedy hedge-fund guys' interested in wiping out the owners' equity stake" and stated that the creditors (principally the Defendants) had "taken approximately $14 million in fees and interest out of the property.";

g. **_Franklin Place Project._**  In approximately 2011, Defendant Stamolis, Defendant Julis and Defendant Friedman fraudulently refused to approve an inter-creditor agreement for the 5 Franklin Place development in lower Manhattan thereby denying it the necessary financing to complete the project and in turn, ultimately causing the New York development to be foreclosed upon;

h. **_Intracoastal Mall Project_**.  In approximately 2012, the Defendants, at the direction and control of Defendants Julis and Friedman, placed into default the Intracoastal Mall, a Florida development. The court filings reflect an all-too-familiar playbook:   the Defendants "colluded to prevent" Intracoastal's performance under the Loan, "fabricated" "sham" defaults to steal the property and "starve[d] the property from income" by "rejecting leases that are

indisputably commercially reasonable" and "sweeping – without notice" funds necessary to pay operating expenses to create bogus defaults to support the Defendants' claims; and

i.  ***Waterbridge Capital Project.***  In approximately 2014 an affiliated entity of Defendants, at the direction and control of Defendants Friedman and Julis, victimized an affiliate of Waterbridge Capital, a New York developer, in a project located in Los Angeles, California by creating a relentless series of bogus default notices beginning almost immediately after the loan documents were signed.

31.    In addition to the above nine victims, Packard Square's investigation has uncovered Defendants' scheme to steal the equity in College Terrace Centre LLC's ("College Terrace") project in Palo Alto, California.  The College Terrace property had been owned by the same family for approximately 100 years.  The family wished to develop the College Terrace property, which is in the heart of downtown Palo Alto.

32.    The College Terrace loan closed in December 2013.  Prior to closing, one of College Terrace's principals raised the following prescient concern with the mortgage broker:

> Well my assessment is this – Jonathon [Roth of Canyon] is a
> personable, charming person who has not stayed the course and

is squeezing the numbers *to ensure our failure*, all with a smile on his face.

33.     The College Terrace principal continued:

[Defendant] Marti [Page of Canyon] is not to be trusted and has altered agreements, taken intent out of context from the Term Sheet to her own benefit and has delayed this discussion until it puts them in what they perceive as ultimate power…she is either unethical or devious…***In my opinion, they have positioned the property to facilitate their takeover to building.*** Heck, they even had me meet their surrogate and advise her on local resources. It seems clear that this is their intent. ***On this note – I need for you to disclose how many foreclosures they have had over the past five years as this will be a critical piece of information in the decision process on how or if we are to proceed***.

34.     The next day, December 28, 2013, Defendant Page remarkably (and utterly falsely) stated in response that:

We have ***not foreclosed*** on a development deal from what I can remember.

35.     That was far from the truth.  As of December 28, 2013, Defendants had foreclosed on at least nine (9) developments.  In a clear demonstration of the culture at Defendant Canyon Partners Real Estate, Marcus Neupert was copied on Defendant Page's response, and he did not correct the misstatement, even though he is the in-house General Counsel for Canyon Partners Real Estate.

36.     To the extent one wishes to give Defendant Page the benefit of the doubt in terms of her memory, on September 14, 2018, in a deposition in the Washtenaw County Lawsuit, Defendant Page admitted knowing that one of the nine

developments, Cal-Neva, had been placed in foreclosure.

37.    In reliance upon Defendant Page's outright lie about Defendants' foreclosure history, on December 31, 2013, College Terrace closed on the loan from Can IV CT LLC, an entity controlled by Defendants Julis and Friedman on December 31, 2013.   In approximately two months after the loan closing, the fraudulent acts continued with Roth and Defendants Canyon Partners, Canyon Partners Real Estate, Julis, Friedman, Stamolis and Page repeatedly causing defaults to be declared against College Terrace for manufactured non-monetary allegations regarding violations of contract terms not contained in the loan documents, extorted it into signing releases and paying default interest by withholding funds legitimately due to College Terrace under the loan documents, further extorted College Terrace within six months of the loan closing to sign documents which included granting to Can IV CT LLC a springing deed-in-lieu of foreclosure if Defendants elected to declare another default, and intentionally caused construction delays to increase costs to the point where College Terrace was forced to admit Defendants' crony developer into control of its project.

38.    By 2018 without any court proceeding being filed, the Defendants' relentless fraudulent acts ultimately led to College Terrace losing 100% of its equity in addition to the monies Roth and Defendants Canyon Partners, Canyon Partners Real Estate, Julis, Friedman, Stamolis and Page had extorted from it after the loan

closing. All of this occurred without College Terrace missing or being late on a single loan payment.

39. The full scope of the evidence concerning the above victims, and other victims, can only be obtained through discovery. It is difficult, if not altogether impossible, to ascertain additional relevant evidence without discovery because: 1) the Defendants Julis and Friedman have conducted business throughout the United States under hundreds of unusual and single-purpose entity names including off-shore entities domiciled in the Cayman Islands and elsewhere, 2) not all state court records are available online, which makes a thorough search impossible, 3) all of the relevant facts relating to the Defendants' pattern of conducting their businesses are not necessarily found in court documents if victims simply acceded to the Defendants' fraudulent and extortionate demands, and 4) all of the facts and records concerning other victims and whether lies were perpetrated on bankruptcy and state courts are peculiarly within the knowledge, possession and control of the Defendants, as reflected in the emails and testimony set forth below obtained in limited discovery in the State Court evidencing some of the Defendants' lies and misrepresentations with respect to Packard Square.

## III. Defendants' Fraudulent Campaign of Unjustified Default Notices and Extortion

40. Craig Schubiner is an experienced, yet relatively small, property developer and the manager of Plaintiff Packard Square. Drawing on decades of

experience in the development and real estate industries, Schubiner, a graduate of the University of California at Los Angeles, the holder of a Master's degree in Business Administration from the University of Michigan, a licensed builder and a licensed real estate broker, envisioned in detail the Packard Square project after years of planning following the property's acquisition in 2001.

## A.   Defendants' Plan from the Outset to Steal Packard Square's Property

41.   After approximately $14 million was spent in acquiring the site, in conceptualizing and designing the project, and in obtaining the many necessary governmental approvals for the project, including unanimous site plan approvals at all city levels, Schubiner met with Defendant Page to determine whether it was feasible for the Defendant Canyon Partners Real Estate to arrange for a conventional and appropriate loan to Packard Square for construction financing of the Packard Square project.  Schubiner had been introduced to Defendant Page through a New York real estate mortgage banker.   During the spring and summer of 2014, Defendant Page consulted with the Defendants' real estate investment committee members including Defendant Julis and Defendant Friedman repeatedly regarding issuance and updates to a term sheet for proposed financing for the construction of Packard Square.

42.   On or about September 4, 2014, prior to entering into any loan agreement, the Defendants recognized the potential value of the Packard Square

project and planned to steal the project by weaponizing any loan agreement to create and claim bogus and improper contract defaults and violations of the loan agreement to force Packard Square into default.

43.     In a draft of a memorandum created prior to the signing of loan documents, the Defendants were already planning for a default and were clear "if a default occurs under the Loan, Canyon will be in a position to quickly take title and control the Property at a significant discount to value."  The memorandum was provided to the Defendants' real estate investment committee members prior to Defendants Friedman, Julis, Stamolis, Canyon Partners, and Canyon Partners Real Estate's approval of the loan to Packard Square.  Defendant Page participated in the preparation of this memorandum, approved it and provided it to the real estate investment committee.  Packard Square only obtained this key memorandum on or about April 18, 2018 during the discovery period in the Washtenaw County Lawsuit.

44.     On or about, September 12, 2014,   Newbanks, the Defendants' construction consultant, provided a Construction Documents & Cost Analysis regarding the Packard Square project to Defendant Page which stated, "the proposed project direct hard costs of $31,000,000…are similar to comparable projects…Overall costs are within expectations…It is also our opinion that the construction contingency of $1,277,333 should be adequate."  This total of approximately $32.3 million was comparable to pricing from multiple contractors

which bid in the $32-33 million range to construct the project. Later that day—September 12, 2014—following review of the Construction Documents & Cost Analysis by Chris Stanley, then an employee of Canyon Partners Real Estate, Chris Stanley sent an email to Defendant Page stating, "…construction costs seem high based on comparable properties," confirming Defendants' expectation that the projected costs to construct the project should not exceed the $32-$33 million range.

45.     On or about October 1, 2014, the Defendants caused Can IV Packard Square LLC, a Delaware liability company created by Defendant Canyon Partners Real Estate for the purpose of making a loan to Packard Square, to sign a construction loan with Packard Square for up to a maximum amount of $53,783,184 (the "October 2014 Loan Documents"). The October 1, 2014 closing had been delayed from September 15, 2014, because at the eleventh hour, the originally planned contractor for the project was unable to provide a payment and performance bond to ensure against cost overruns. Defendant Page sent an email to Schubiner through interstate wires on September 17, 2014 stating that "Bond must be in place before Canyon authorizes closing" and refused to allow Packard Square to hire the then planned contractor, while still charging interest on the loan beginning on September 15, 2014.

46.     A key aspect of Defendants' scheme was to lull Schubiner into believing that Defendants would cooperate with Packard Square on the milestones

set forth in the loan documents.  For example, on August 20, 2014, Packard Square's counsel asked that "changes" to the construction schedule "not be unreasonably withheld."  Defendant Page responded in an email demurring to add this change to the loan agreement, but assuring Packard Square's counsel that "we're motivated to see this project get complete [sic] so I think you'll find in practice that we're very reasonable."

47.    The October 2014 Loan Documents were then finalized after consultations with and directions from Defendants Friedman, Julis and Stamolis to contain provisions for commencing site work before Defendant Canyon Partners Real Estate was to approve a "replacement contractor" who could provide the requisite payment and performance bond in the months following the loan closing. Given Defendants' requirement to change contractors, Defendant Page sent an email to Schubiner on September 30, 2014, stating that the milestone dates required for completion of the project would be determined post-closing, again lulling Packard Square into believing that Defendants wanted to work cooperatively with Packard Square.

### B.    Defendants' Justification for Bogus Default Notices

48.    On November 7, 2014, Defendant Page sent an email to Schubiner through interstate wires when Packard Square was about to begin site work on the project and stated "Craig – just curious – are you starting the site work pre-GMP

[guaranteed maximum price contract] because of our milestones or because it's critical for maintaining the construction timeline?" implying that Schubiner did not need to be concerned about strictly adhering to the milestones in the October 2014 Loan Documents.

49.    Also, immediately after the signing of the October 2014 Loan Documents, the Defendant Canyon Partners Real Estate refused to release the $2.65 million allocated for the purchase of the site adjacent to the project, located at 2500 Packard Street.   As later events revealed, Defendants Stamolis and Goldman also refused to allow the $2.65 million to be used for any purpose, despite charging interest on those funds and even though prior to the closing of the October 2014 Loan Documents on September 24, 2014, Defendant Page had sent an email through interstate wires to Schubiner stating that those funds could instead be used for future cost overruns.

50.    Shortly after the signing of the October 2014 Loan Documents, the Defendants began a campaign of creating excuses not to extend the necessary funds to complete the project and then causing CAN IV Packard Square LLC to send default notices to Packard Square – repeatedly designed to place Packard Square in default with the object to steal the property and/or the equity therein at a significant discount.

51.    On December 1, 2014, the Defendant Canyon Partners Real Estate

caused a Notice of Event of Default and Forbearance, executed by Defendant Stamolis as authorized signatory, to be sent through interstate wires and private and commercial interstate carriers falsely stating that Packard Square was in default because it had "neither executed a site work contract nor commenced site work." The Defendant Canyon Partners Real Estate then caused the charging of default interest at 16% on funds that they had not yet even disbursed to Packard Square and threatened foreclosure, while at the same time demanding that Packard Square waive any and all claims against them.

52.    As of November 6, 2014, the Defendants, as their own attorney admitted in an email sent through interstate wires, had "not yet authorized commencement" of the site work and "[o]nce commencement is authorized we will review the NOC [Notice of Commencement] and provide comments, if any."  As of the date of the first default notice, December 1, 2014, the Defendant Canyon Partners Real Estate had never authorized the site work.  The fact that the Defendants Stamolis, Goldman and Canyon Partners Real Estate and others involved generated the default notice under false pretenses is evidenced by the fact that it was these same Defendants who and which delayed the execution of the site work contract and the commencement of the site work.  Despite their intentional delay of authorization, Packard Square started the site work on November 8, 2014.

53.    On December 4, 2014, Defendant Goldman pressured Schubiner

further by sending an email to him through interstate wires and stating "I need the signed forbearance immediately." Later that same day, Defendants' in-house counsel, Roshan Sonthalia, sent another email to Schubiner through interstate wires stating, "We need to have this forbearance agreement signed immediately."

54.     On December 19, 2014, the Defendant Canyon Partners Real Estate caused another default letter to be sent, executed again by Defendant Stamolis as authorized signatory, through interstate wires and a commercial interstate carrier that falsely stated that Packard Square was in default because it had failed to name a "single" replacement contractor to replace the originally planned contractor who was unable to obtain the requisite $32.3 million performance bond prior to the October 1, 2014 loan closing.

55.     The nefarious nature of this default notice is evidenced by the fact that on November 24, 2014, twenty-five (25) days before sending the default notice, Packard Square had sent a letter to the Defendant Canyon Partners Real Estate naming not one but three possible replacement contractors. Packard Square's letter had clearly met the intent of the extension requirement (which did not prohibit the naming of back-up alternative contractors) and was sent timely within the five-day window allowed under the October 2014 Loan Documents. Moreover, Defendants Goldman, Stamolis and Canyon Partners Real Estate were also aware that two of the three suggested contractors had been reviewing the contract documents two weeks

earlier, and Defendants raised no objections. Thus, the alleged defaults and concurrent refusal to release loan disbursements were not justified because naming more than one potential replacement contractor could not be a material default. In fact, maintaining back-up contractors until a contract was fully-executed was a necessary and prudent measure that was not precluded under the October 2014 Loan Documents. All told, the December 19, 2014 default letter delayed the project by over a month, which was all in furtherance of the Defendants' devious pattern of fraudulent acts and plan to steal Packard Square's property and its equity in that property.

56.     Simultaneously on December 19, 2014, Defendants sent an email through interstate wires attaching a Pre-Negotiation Agreement and stated, "Please note that if Borrower desires to engage in further discussions, the attached Pre-Negotiation Agreement will need to be executed by the appropriate parties and returned to Lender." Later that day, Defendant Goldman sent another email through interstate wires to Schubiner stating, "Roshan and I are available Monday to discuss the loan provided we receive the executed Pre-negotiation agreement in advance of any discussions." In response to Defendants' demands, Schubiner responded with an amended version of the Pre-Negotiation Agreement.

57.     On December 22, 2014, Roshan Sonthalia sent an email to Packard Square's counsel, John Sier, copied Defendant Goldman, and stated, "John - the

letter signed by your client contains changes that were not acceptable to us. We will be recirculating an updated version of the letter, and we cannot schedule a discussion until there is a signed pre negotiation agreement that is acceptable to us. If you wish to schedule the call now, your client can return the pre negotiation agreement that was circulated on Friday." Despite the Defendants' repeated pressure tactics, Schubiner refused to sign either Defendants' version of the Pre-Negotiation Agreement or the Notice of Event of Default and Forbearance.

58.   After the Defendants Stamolis, Goldman and Canyon Partners Real Estate's pressure tactics and deliberate delays in approving a replacement contractor among the three proposed by Packard Square, on February 25, 2015, Packard Square eventually executed the construction contract with the replacement contractor, Quandel. But in furtherance of their fraudulent scheme, Roth and Defendants Stamolis, Goldman and Canyon Partners Real Estate had refused for months to release funds for Packard Square's ongoing construction costs and forced Packard Square to fund construction costs, even though separately the Defendants were causing the default rate of interest to be accrued on the funds borrowed for these very costs in violation of the October 2014 Loan Agreements.

59.   Soon after the February 2015 execution of the Quandel contract, the Defendants caused further calculated delays and demanded unwarranted punishments, namely, that Packard Square execute an onerous Reinstatement and

Amendment Agreement; pay more than $150,000.00 as a penalty; acknowledge in writing a loan default which had significant repercussions under the October 2014 Loan Documents; and, provide a waiver of all defaults against the Defendants and their affiliated entities. This was despite the fact that Quandel had provided the requisite $32.3 million bond from Western Surety, which insured its guaranteed maximum price contract of the same amount and which was consistent with the project's budget. At first, Schubiner refused to accede to these arbitrary and extortionate demands.

60.     On March 27, 2015, Schubiner emailed Defendant Goldman and counsel for Defendants and stated:

> Canyon has been kept up to speed every step of the way and approved the letter of intent with Quandel in early January. Defaults did not occur but rather incredible feats to right the ship occurred without damage. I can't understand how I am being told that there are no further comments on the Quandel GMP amendment but that I can't sign it unless I sign a document that I don't agree with…My understanding was that the draw would be released and default interest would be reversed when the Quandel contract and GMP were done. I thought you would be so glad that everything is on track. I was told that Canyon was the lender who would be understanding when construction issues arise. Construction was kept going while the contract and GMP were completed - all with continual communication to Canyon along the way…The situation has been dealt with and with a great result. Instead, I was screamed at for an hour the other day. I really don't get it…I hope someone there can call and peacefully talk everything through. I am tired.

61.     Later that day in response to Schubiner's refusal to sign the

Reinstatement and Amendment Agreement, Defendant Page sent an email to Schubiner through interstate wires stating, "Craig – look at the big picture and sign the reinstatement agreement." Schubiner saw no basis to reinstate and amend the October 2014 Loan Documents or pay any penalty and continued to resist the extortionate pressure of Defendant Page and the other Defendants.

62.   On March 29, 2015, counsel for Packard Square sent a letter by email to counsel for Defendants stating, in pertinent part:

> We hope that any demands based on inaccurate information and/or delayed approvals do not continue through the life of this project. The initial difficulties have been overcome though tremendous effort and personal expense by Mr. Schubiner – much to Canyon's benefit. The project can proceed in an orderly fashion only so long as any approvals required by Canyon occur in a more timely manner to avoid creating schedule complications…This loan began with an unusual situation when Borrower and Lender were stood-up at the original closing when the original approved contractor, TH Marsh, was unable to obtain the required performance and payment bonds. *Yet the parties chose to close the loan and make the identification of the contractor, execution of the construction contract and approval of the GMP amendment as post-closing requirements. Despite long response times or missing responses from Canyon and the lack of disbursements that clearly should have been funded, Mr. Schubiner has kept the project on-time and on-budget with a contractor, construction contract and GMP Amendment - all approved by Canyon.* These are significant accomplishments especially in light of the abbreviated history outlined above. Given that everything is on track with an approved GMP [guaranteed maximum price construction contract] and schedule in place, it makes sense for the parties to put the past behind them and execute a loan amendment that voids the default letters and default interest.

63.    On March 30, 2015, Defendant Page continued to pressure Schubiner by emailing him again through interstate wires, stating "we have not received a signed agreement that you have discussed with your attorney" and warning that the "Deadline remains 9 am PST."   On that same day, within a few hours after the unilateral deadline imposed by the Defendant Page had passed, the Defendants, at the direction of Defendants Stamolis, Julis and Friedman and two other investment committee members, caused their affiliate, CAN IV Packard Square LLC to retaliate by quickly accelerating the entire loan, calling it immediately due and payable, the consequences of which would have required Packard Square to pay 15% interest as if the entire approximately $53.7 million had been loaned for a full year—when up to that point Packard Square had been advanced less than $6.3 million for less than six months—and despite the fact that vertical construction, the primary purpose of the approximate $53.7 million loan, had not yet begun.

64.    The Defendants caused to be delivered to Packard Square on March 30, 2015, through interstate wires and a commercial interstate carrier, the March 30, 2015 acceleration letter, executed by Plaga as authorized signatory.   In that letter, the Defendants falsely claimed that Packard Square breached the October 2014 Loan Documents for not purchasing the building adjacent to the Packard Square project (even though on September 24, 2014, the Defendant Canyon Partners Real Estate had, as alleged in paragraph 49 above, refused to let Packard Square purchase that

building).  The acceleration letter demanded that Packard Square pay immediately $17,574,064.71.    The  Defendants  attempted  to  extort  this  fraudulent  and unconscionable  amount,  even  though  they  had  caused  to  be  advanced  less  than $6,300,000 to Packard Square and no payments whatsoever were due and payable at the time.

65.    Having been placed in fear of losing the project, Schubiner succumbed and signed the Reinstatement and Amendment Agreement, returning it with a cover note which stated:

> I have not heard from outside counsel today so I am only signing this without the chance to get legal advice based on your stated instructions to [start] foreclosure if the deadline stated is missed. I view this whole thing as incredibly unfair and unwarranted and I really wish I was not pressured to sign this.

66.    The Defendants then refused to accept the executed Reinstatement and Amendment Agreement unless Schubiner disavowed his cover note.  On March 29, 2015,  confronted  with  no  other  choice,  Schubiner  was  forced  to  submit  to  their corrupt and extortionate demands and disavowed his cover note.  It was only at that point  that  the  Defendants  finally  approved  the  $32.3  million  GMP  [guaranteed maximum price] amendment with Quandel.  However, Defendants did so without extending the milestone dates for completion, as Defendant Page promised and that were  established  for  the  prior  contractor's  start  originally  planned  for  mid-September of 2014.

67.     Between on or about April 1, 2015, and March 1, 2016, the Defendants relied on Packard Square's expertise to complete the most difficult parts of the design, development and construction such as numerous governmental approvals, hundreds of pages of construction drawings, site work, underground piping, foundations, structure and framing of the project, windows, roof, the swimming pool, and a substantial portion of the mechanical, electrical, plumbing and fire suppression systems.

68.     On August 4, 2015, Roth sent an email through interstate wires to one of Defendants' investors, the University of Michigan Endowment, stating, "I am also happy to report that our Packard Square multifamily project is doing well.  Our borrower is on time and on budget with a world class team.  I just received an updated marketing book for the project and it looks fantastic.  I really think that when complete, it will be a great addition to your community."

69.     On or about March 14, 2016, Defendant Goldman reported to Defendant Stamolis in an email on his March 11, 2016 visit to the project.  In that email Defendant Goldman wrote:  "almost all of the windows are in and the framing is nearly complete," "[t]he work is progressing on schedule and on budget," and "[t]here is no new apartment product comparable as Packard [Square] is one of the last remaining large infill sites."

70.     Beginning in approximately April 2016, the Defendants, knowing that

Packard Square's property was unique and that the value had dramatically increased, initiated further deceptive measures to fabricate defaults under the October 2014 Loan Documents. On or about April 21, 2016, the Defendant Canyon Partners Real Estate sent emails through interstate wires to Schubiner initiating bogus milestone extensions that could only be attributable to a foundation settlement issue that in fact affected for a short duration only approximately 2% to 3% of the project. Since 97% to 98% of the work was unaffected by this settlement issue, no written loan amendments were necessary to address this issue. However, as Packard Square later learned, these bogus milestone extensions were created to advance the Defendants' secret corrupt agenda of placing the property in foreclosure to steal Packard Square's equity.

71.     In or about the spring of 2016 Defendant Goldman stated orally to Schubiner that the interim milestone amendment was a mere paperwork notation, and in an email on April 21, 2016, sent through interstate wires, Defendant Goldman informed Schubiner that "we want our loan to be in compliance" and that "[t]o entertain a change, we need the dates, thanks." This was among the many misleading statements the Defendant Canyon Partners Real Estate made to Packard Square to create a false sense of trust.

72.     On or about May 31, 2016, Newbanks notified the Defendants in their regular monthly reports of, among other things, force majeure events "affecting the

41

Critical Path of the work such as main water connection, mechanical dampers and main electrical room concrete pad."  Concurrently, there were various force majeure issues including a labor dispute and strike involving the electricians for the project, and manpower issues in the marketplace, which affected the completion date for the project.  Instead of legitimately adjusting milestone dates for force majeure events as provided for in the October 2014 Loan Documents and rectifying the many earlier delays the Defendants had intentionally caused, the Defendants instead sought to exploit the situation by crafting loan amendments with unreasonably short deadlines for interim construction work, while simultaneously making false oral promises that future extensions of the final completion dates would be granted as necessary.  As later events revealed, this charade of providing unnecessary and intentionally short extensions of interim milestone dates was designed to create the misleading illusion that the Defendants had granted Packard Square many concessions.

73.    The Defendants concealed the Newbanks reports from Packard Square, and on or about July 28, 2016, Defendant Scholz circulated to Defendant Goldman and an employee of the Defendant Canyon Partners Real Estate, and without disclosure to Packard Square, a list of possible defaults by Packard Square as part of the Defendants' scheme to fabricate further false rationales to usurp Packard Square's project.

74.    In furtherance of that scheme, at a meeting at the project site on August

10, 2016, Defendant Page falsely assured Schubiner that the Defendants agreed with Packard Square regarding delays associated with force majeure events and other issues then associated with Quandel's performance and promised that the Defendants were going to cause the extension of the milestone dates as required by the October 2014 Loan Documents and as necessary for completion of the project, and that the Defendants would not be causing default notices to be sent to Packard Square. Defendant Page's assurances regarding the milestones were part of Defendants' pattern of racketeering activities and premeditated scheme with regard to Packard Square prior to the signing of the October 2014 Loan Documents as alleged above, and was designed to lull Schubiner into believing that Defendants would deal with him honestly and reasonably, when in fact their true motives were to lull him into a false sense of security as part of the Defendants' scheme to steal the Packard Square property.

75. In direct contradiction to Defendant Page's assurances that the October 2014 Loan Documents would be complied with by the Defendants by extending the milestone dates as necessary for completion of the project due to the force majeure events, the Defendants never extended the later interim milestone dates or the major milestone dates for completion, as required by the October 2014 Loan Documents. Instead, the Defendants intentionally resumed their campaign of sending unjustified default notices, the only purpose of which was to set up Packard Square for default

on the Defendants' loans.

76. To intentionally cause issues and distress, the Defendants unilaterally only partially funded construction draws for June, July and August 2016—while still charging interest on over $20 million of unreleased funds. In furtherance of their overall scheme to defraud, the Defendants continued to cause unjustified default letters and emails to be sent to Packard Square, often blaming Packard Square for repercussions caused intentionally by the Defendants, by delivering the default letters and emails through interstate wires and commercial interstate carriers as set forth below by date and false and/or misleading reason for default:

| Date | False and/or Misleading Reason for Default |
|------|---------------------------------------------|
| August 17, 2016 | The Defendant Canyon Partners caused to be sent a letter, executed by Plaga as authorized signatory, falsely stating that "Borrower will not achieve Substantial Completion or Final Completion by the Substantial Completion Date or the Final Completion date," when in truth and in fact the Defendants knew there was not only no legitimate basis for this statement but any delay was attributable to 1) the Defendants who were not funding draws for the work that needed to be completed, and 2) force majeure events, which required for extensions of the Substantial and Final Completion Dates. |
| August 26, 2016 | The Defendant Canyon Partners caused to be sent a letter, executed by Kaplan as authorized signatory, falsely stating "Borrower failed to complete Framing (which had been materially complete for months) MEP [mechanical electrical plumbing] Rough-Ins and Building Enclosure by August 26, 2016, when in truth and in fact the Defendants, based on Defendant Goldman's email, knew as of March 14, 2016 the framing was "nearly complete," (*see* paragraph 69 above) through their own consultant, Newbanks, and that the failure to fully complete the other |

| Date | False and/or Misleading Reason for Default |
|------|--------------------------------------------|
|  | items was legitimately caused by a city inspector directing that 450 fire dampers be added, of which Newbanks had informed the Defendants on June 13 and July 27, 2016, and was an event of force majeure resulting in excusable delay and requiring milestone extensions pursuant to the contract terms—among other force majeure events, including the foundation settlement issue, which subsequently delayed the building enclosure to a minor extent and for which the Defendants had full knowledge. |
| September 8, 2016 | The Defendant Canyon Partners caused to be sent an email, written by Scholz, falsely stating that "Lender informed Borrower of certain Events of Defaults by letter dated August 26, 2016.  To date, such Events of Default remain outstanding," when in truth and in fact Packard Square was not in default, but rather Defendants caused defaults under the October 2014 Loan Documents, and Defendants had no right to disburse funds from the Interest Reserve for "Default Interest." |
| September 29, 2016 | The Defendant Canyon Partners caused to be sent a letter, executed by Kaplan as authorized signatory, falsely blaming Packard Square for failing "to complete the Parking Lot and Site Concrete by September 26, 2016," when this failure was intentionally caused by the Defendants failing to fund draws starting in June 2016, failing to fund the contractor Jermor Plumbing to complete the underground plumbing before the Parking Lot and Site Concrete could be done and the Defendants' purposeful failure to comply with the contract terms regarding milestone extensions. |
| October 19, 2016 | The Defendant Canyon Partners caused to be sent a letter, executed by Plaga as authorized signatory, corruptly placing responsibility on Packard Square for two liens totaling approximately $1.2 million, when in truth and in fact the lien claimants were not owed anything, Packard Square had the contractual right to contest the liens under the October 2014 Loan Documents; and, in any event, the Defendants were responsible for the liens remaining on the property's title, since they had purposely chosen not to release to Packard Square the funds to pay those liens, |

| Date | False and/or Misleading Reason for Default |
|------|---------------------------------------------|
| | even after approving the amounts to be paid, to support their planned effort to have a Receiver appointed in the litigation it filed two days later. |
| October 21, 2016 | The Defendant Canyon Partners caused to be sent a letter, executed by Kaplan as authorized signatory, falsely stating that "Borrower failed to complete the Interior Finishes by October 20, 2016, as required," when in truth and in fact the Defendants knew that the above-described MEP Rough-Ins were a prerequisite to completing the finishes and therefore, they were informed by their own consultant Newbanks of excusable events of force majeure and which force majeure events required the milestones to be extended and which were compounded by the Defendants earlier caused delays as well as their failure to fully fund construction draws. |

## C.    Defendants' Further Actions to Steal Packard Square's Property

77.    In furtherance of their fraudulent campaign, the Defendant Canyon Partners Real Estate in or about September 2016, at a time when the project was overall 60% to 65% complete, terminated the services of Newbanks, the nationally-respected construction consulting firm, which was highly familiar with the project, after Newbanks disclosed repeatedly in writing the force majeure events to the Defendants and consistently rendered reports that favorably depicted Packard Square's successful performance.    The actual reason for the termination of Newbanks was that its reports of Packard Square's performance were too positive and glowing, and Newbanks refused to follow the Defendants' directions that Newbanks falsify its reports and characterize the project as being in shambles.

46

78.    In or about September 2016, knowing that the positive Newbanks reports would negate their planned scheme to seek a Receiver to assume control of the project (and while ensuring that the favorable Newbanks reports would continue to be concealed from Packard Square), the Defendants replaced Newbanks with New York-based Tina Van Curen ("Van Curen"), a former employee of the Defendants as their putative construction consultant and accompanied her to visit the site on September 15, 2016 with Defendants Goldman and Scholz as well as an attorney, Janine Getler, later learned to be the Defendants' project manager.

79.    Concurrently, the Newbanks report, dated September 15, 2016, unbeknownst to Packard Square at the time, stated that "our firm did not identify any visually apparent unaddressed deficiencies.  The overall quality of the work that was visible and observed on the date of the site visit appeared to be in general conformance with industry standards and the intent of the construction plans & specifications."  The report also stated that, "at industry standard levels…the work can be completed by May 1, 2017."

80.    On September 16, 2016, the day after the site visit, Defendant Scholz sent emails through interstate wires to Schubiner stating, "Craig, It was great to see you yesterday," and "Craig, Thanks again for the tour yesterday.  Can you please request Pinnacle to send an updated market survey?  We are curious to see how the market has changed since our closing.  Thanks."  Significantly, the communications

from the Defendants and Van Curen to Packard Square following the September 15, 2016 site visit were positive and friendly and did not complain of construction issues or specify any necessary pre-winter work, again continuing to lull Schubiner into a false sense of security to believe that the lender's and borrower's goals were aligned and that Defendants would deal with Packard Square honestly, in accordance with the October 2014 Loan Documents and adhering to Defendants' oral representations and promises.

81.    Newbanks' termination preceded the then planned replacement of the troubled construction manager, Quandel, which experienced company-wide staffing issues and other problems.   Defendant Goldman repeatedly encouraged the immediate termination of Quandel and to even ignore the notice requirements of the Quandel contract termination language.   Instead, Schubiner followed the contract terms and identified C. E. Gleeson Constructors ("Gleeson") as the close-out contractor to complete the building.   Pursuant to Defendant Goldman's request, Schubiner sent an email on September 30, 2016 to him and Defendant Scholz which detailed financial and construction experience information regarding Gleeson, along with a six-month schedule for completion.   Despite many promises to respond to this request, Defendant Goldman purposefully never responded to Schubiner—again leaving the project in indefensible limbo while wasting Packard Square's time and money.

48

82.     Suddenly on or about October 14, 2016, without advance warning, the Defendants, at the direction of Defendants Julis, Friedman, Stamolis and the other investment committee members, knowing that the value of the Packard Square project continued to increase in value, caused an email (with Neupert and Defendants Stamolis, Goldman and Scholz copied) to be sent through interstate wires to Packard Square attaching a fully-drafted deed-in-lieu of foreclosure document which Defendant Stamolis testified on May 3, 2018 was designed to "wipe-out" Packard Square's ownership interest.  Schubiner responded by stating, "Before this loan was made, we were told that Canyon understood construction issues and would be great to work with.  The project is only a few months late.  It is more on time than most projects in Ann Arbor.  We should not be seeing any documents like these.  This is very troubling.  It appears that Canyon wants to create a serious problem when there isn't one.  We have a great project that is progressing well now and we should be on the same team."

83.     On October 14, 2016, Schubiner also emailed Defendant Page asking her if she was "available to talk about this" deed-in-lieu of foreclosure, and she simply did not respond.  Through this document the Defendants sought to compel Packard Square to simply relinquish its property to the Defendants' related entity, despite the facts that (i) no loan payments by Packard Square were ever missed or late, (ii) all taxes and insurance premiums were paid by Packard Square on a timely

basis, (iii) no city violations had been issued, or allegations of fraud or misappropriation of loan funds were ever made, (iv) more than $20 million was available in unreleased loan interest and construction reserves, and (v) the loan maturity was not until April 1, 2017 and there were extension options until April 1, 2018. Of course, Packard Square refused the Defendants' demand to deed its property to the Defendants for no consideration whatsoever.

84. Despite Defendants Goldman's and Scholz's refusal to respond to the information provided regarding Gleeson, Packard Square took the affirmative step to replace Quandel with Gleeson on October 17, 2016, to finish the approximately $11.2 million of work remaining under Quandel's GMP [guaranteed maximum price] contract, which amount was insured by the $32.3 million payment and performance bond. In the schedule provided to Defendant Goldman and Defendant Scholz on September 30, 2016, Gleeson had then scheduled completion of the project in under six months—that is, by March 2017. With Quandel out of the picture, the project was proceeding effectively under Gleeson. The completion of the project by Gleeson and Packard Square by March 2017 would, if the Defendants did not interfere, have thwarted their long-planned objective of seizing the substantial equity in the Packard Square project for themselves. Completing the project by March 2017 was within the 150-day extension allowed by the force majeure provision in the October 2014 Loan Documents. Thus, without taking into

account the multi-monthly delay caused by Defendants' requirements to execute a GMP contract with a replacement contractor as well as Defendants' many other intentionally caused delays and failures to fully fund construction draws (while still charging interest on the unreleased funds), the project was scheduled to be completed on time as provided for in the October 2014 Loan Documents.

85.     On October 17, 2016, Defendant Scholz sent an internal email to Defendant Goldman through interstate wires stating that Packard Square's draw request through August 31, 2016 was approved by him and Van Curen.  Defendant Goldman responded through interstate wires and stated, "Hold for now, we will be having a broader discussion today, thanks."  This intentional failure to fund and the illegitimate partial fundings (*see* paragraph 76 above), which the Defendants later caused to be admitted on December 12, 2016 in Requests for Admissions in the Washtenaw County Lawsuit not only violated the October 2014 Loan Documents but caused, and were intended to cause, severe financial hardship to Packard Square, rendering its performance impossible.

86.     On or about October 19 and 20, 2016, at the Defendants' offices in New York and Los Angeles, Defendant Scholz continued to collect market data for the Defendants and enthusiastically shared with Defendant Page, Defendant Goldman and Defendant Stamolis in multiple emails sent through interstate wires that "Ann Arbor is currently the #1 strongest submarket" for apartments in the entire United

States, that rents had increased 23% since the loan origination, and that the Packard Square project was projected, upon completion, to be worth $98.6 million.  On October 16, 2016, Defendant Page, in response to this marketing data, sent an email through interstate wires to Defendant Scholz, "Wow? Current projected rents are 23% higher than the $1.82 psf [per square foot] we projected."  Yet at the time, the Defendants had funded only approximately $33 million to Packard Square.

87.    In early October 2016, Defendant Goldman telephoned Schubiner through interstate wires and asked him to travel to Los Angeles to meet with Defendants.

88.    On October 20, 2016, Schubiner met with Defendant Stamolis and Defendant Goldman in Los Angeles at which time they demanded baselessly that Packard Square inject more money into the project.  When Schubiner asked to see their calculations and to use the $2,650,000 designated in the October 2014 Loan Documents for the purchase of the site adjacent to the project, the Defendants refused to document the need for any new funds and refused to allow any use whatsoever of the $2,650,000 even though Defendant Page had sent an email to Schubiner through interstate wires on September 24, 2014 specifically stating that these funds could be used for cost overruns, and even in light of the fact that the Defendants had been charging Packard Square 16% default interest on these funds, along with an additional $18,000,000, since August 26, 2016.

89.     Defendant Julis's and Defendant Friedman's intimate involvement and control over the criminal acts against Packard Square is further evidenced by the fact that they sent, received and/or were copied on at least thirty-seven (37) emails relating to Packard Square between October 17 and October 21, 2016, with subjects including but not limited to "Packard-Investor Update Proposal" and "Packard Square $53.8M Senior Loan - Non-Performing Loan Advisory 10 18 16 Update.mht."  Defendants have withheld these emails from Packard Square in the Washtenaw County Lawsuit based on an improper assertion of the attorney-client privilege; however, upon information and belief, these emails included discussions in furtherance of the criminal acts alleged herein regarding sweeping Packard Square's bank accounts, starting a foreclosure lawsuit against Packard Square (while its manager, Schubiner, was intentionally diverted across the country to the Defendants' office) with the ultimate goal of taking title to the project, and communications with Reliance Standard Life Insurance Company and its affiliates and DUMAC Inc. and its affiliates about repaying nearly $20 million of their investments in the Packard Square loan which had a 10% interest rate and immediately reinvesting these funds in a Receiver Loan at a 16% interest rate.

## IV.  The Defendants' Scheme to Defraud by Assuming Control of Packard Square through the Appointment of a Receiver

90.     On or about October 21, 2016—the day after the Los Angeles meeting—the Defendants, as premeditated and directed by Defendants Julis and

Friedman, accelerated the $53.7 million loan, called it immediately due and payable, and filed a complaint for judicial foreclosure and an *ex parte* "emergency" motion for the appointment of a "Receiver" for the Packard Square project and Packard Square itself in the Michigan Circuit Court (the "State Court"), *CAN IV Packard Square LLC* v. *Packard Square LLC, et al.*, Case No. 16-990-CB (the "Washtenaw County Lawsuit"). In the course of that proceeding, the Defendants were able to have a receiver appointed to assume control of the property based on false, fictitious and fraudulent representations to the State Court—less than 72 hours after the service of the complaint and motion for the appointment of a receiver and without any evidentiary hearing. The Defendants designated Defendant Scholz as the corporate representative of Can IV Packard Square LLC in the Washtenaw County Lawsuit.

### A. Defendants' Scheme to Defraud through False Statements to the Michigan State Court

91. The Defendants' pattern of lies, misrepresentations and falsehoods presented to the State Court, which later emerged for the first time approximately 17 months later through limited discovery following the October 2016 Hearing (and which were not part of the record then available for appeal of the initial order appointing the Receiver), were extensive.

### a. The Lie about Packard Square's Responsibility for Liens

92. At the October 2016 Hearing the Defendants concocted the falsehood

that Packard Square had been "squabbling with his contractor to the point where construction liens are filed." Even though Packard Square was entitled from the October 2014 Loan Documents to funds from the Defendants to pay these contractors and had specifically requested in August 2016 that these contractors be paid, and even though Defendant Scholz and Van Curen approved the payments, and the Defendants had been wrongfully charging the default rate of interest on this money for months, the Defendants purposely and corruptly held off paying these subcontractors to maintain those liens fraudulently against Packard Square in the October 2016 Hearing to justify the appointment of a Receiver, even though they had intentionally prevented the liens from being discharged.

93.     Specifically, two subcontractor liens filed by Jermor Plumbing and Gaylor Electric were the centerpiece of Defendants' premediated scheme to cause the abrupt appointment of the Receiver even though the thirty-day period for Packard Square to contest liens provided for in the October 2016 Loan Documents had not yet elapsed when the Washtenaw County Lawsuit was filed. Defendants caused Packard Square to be blamed for these liens in the Washtenaw County Lawsuit while concealing both their internal approval of the requisite payments to these subcontractors and Van Curen's assessment that these plumbing and electrical portions of the project were then 40% complete, rendering no payment whatsoever due and owing to either Jermor Plumbing or Gaylor Electric and negating any

justifications whatsoever for Packard Square to be defaulted for these illegitimate liens.  However, Van Curen's true assessment of the percentage complete of the plumbing and electrical work was intentionally concealed from Packard Square.  It was not until February 2019 when Packard Square discovered the January 10, 2019 deposition testimony of Van Curen and a much more detailed August 14, 2018 report from Van Curen ("Van Curen Supplement") addressed to counsel for Defendants, which supplemented the Van Curen Declaration, as further particularized below. The Van Curen Supplement and Van Curen's January 10, 2019 deposition testimony are evidence in a lawsuit Defendants caused to be filed on August 30, 2017, against Newbanks, *Canyon Partners Real Estate LLC v. Newbanks/Washington Construction Consulting Services, Inc., Case No. 2:17-cv-12852-BAF-RSW, Hon. Bernard A. Friedman, United States District Court Eastern District of Michigan Southern Division* (the "Newbanks Lawsuit").  Packard Square only recently discovered this information from the Newbanks Lawsuit, making it unavailable for more than the two-year duration of the Washtenaw County Lawsuit and consequently was not part of the record available for appeals in the Michigan appellate courts.

### b.  The Winterization Lie Designed to Create the Illusion of an Emergency

94.     In their initial pleadings on October 21, 2016, the Defendants fabricated a fictionalized emergency that Packard Square failed to maintain the property in a

good and safe condition for the winter and that harm was imminent.  At no prior time had the Defendants sent a demand notice with a list of urgent "winterization" items. As was required by the October 2014 Loan Documents and as a matter of custom in the industry, a legitimate lender with real concerns would have first contacted the developer and demanded that a detailed list of so-called urgent 'winterization" items be completed by a date certain, and Packard Square would then have had 45 days to remedy any issues.  The falsity of this emergency was proven on May 4, 2018, more than a year and a half later, when Packard Square deposed Defendant Goldman, the Managing Director of the Defendant Canyon Partners Real Estate.  Defendant Goldman not only admitted the term "winterize" is nowhere in the loan agreement, which was one of the October 2014 Loan Documents, but also admitted that no one ever told him "what the items were that were necessary before the building would be allegedly damaged."  Additionally, there is no mention of imminent harm or a need for winterization in the Van Curen Supplement.

### c.  The "Game Plan" Lie

95.    The Defendants caused to be falsely and repeatedly asserted in open court that McKinley, Inc., the Defendants' proposed Receiver and developer of Packard Square's property, and Matthew Mason, as the Defendants' proposed representative of the Receiver, "have a game plan already set forth of taking over this project and bringing it to completion very quickly."  Nearly seventeen (17)

months later, Packard Square learned through the limited discovery, received from the Defendants a crucial email exchange sent through interstate wires on October 26, 2016 between Mason, Defendant Goldman, Defendant Scholz and Defendants' counsel, the day before the October 2016 Hearing.  That email outlined the actual plan to suspend the project in full for the winter and only "begin construction in earnest once the frost laws are lifted," which generally occurs in Michigan in March or April each spring, approximately six (6) months after the Defendants' false representation that it had a "game plan" to bring the project "to completion very quickly."  There was no legitimate reason to suspend all construction during the winter since the overall construction had been approximately 60% completed, and construction on nearly all aspects of the project could have continued during the winter months without violating the frost laws, which come on and off for roughly a month in the late winter or early spring of each year.  The Michigan frost laws were no excuse to delay construction, since the laws only apply to the use of very heavy truck equipment that potentially could damage public roadways in the late winter and early spring of each year.  As of October 2016, there was no legitimate reason not to continue immediately with all aspects of the exterior and interior construction.

### d. The "Disrepair Lie"

96.    The Defendants also caused to be asserted at the initial State Court

hearing that the project was in "jeopardy of going through the winter in a state of disrepair" and that the Defendants possessed both an allegedly credible report and declaration from their consultant, Van Curen, the Defendants' former employee who was the principal of HG Assessment Corp. (the "Van Curen Declaration"). Defendants instructed Van Curen to take the blatantly false positions (i) that Packard Square was failing to take adequate pre-winter precautions for the 2016-2017 winter season, and (ii) that severe winter harm to the project was imminent. The Defendants prepared Van Curen's Declaration that falsely claimed imminent harm and danger to the project, and on October 20, 2016, the day before the Washtenaw County Lawsuit was filed, Defendant Stamolis deemed the immediate preparation of the Van Curen Declaration as "mission critical."

97.     The falsity of the statements in the Van Curen Declaration are proven by the April 16, 2018 deposition testimony of Van Curen that McKinley and Mason had not completed the so-called "winterization" items even after the 2016-2017 winter and that most of the items had still *not* been installed by McKinley and Mason as Receiver before the following 2017-2018 winter. The Defendants caused this admission to be confirmed in their answers to Requests for Admissions in January of 2018. Plainly, the Defendants knew they had lied when they caused it to be claimed on October 27, 2016, in the Washtenaw County Lawsuit pleadings, that Packard Square had created "imminent harm."

### e.  The "Degradation Lie"

98.     At the October 2016 Hearing, the Defendants relied upon the Van
Curen Declaration to falsely state that, under Packard Square's watch, construction
had entirely stopped.  More specifically, the Declaration asserted that, "[a]bsent
immediate recommencement of construction and winterization of the construction
site, the condition of the [b]uilding will degrade, deteriorate, and depreciate."   In
truth and in fact, Packard Square had never, since the Defendants finally approved
the notice of commencement at the end of 2014, stopped construction of the project
while under Packard Square's control.  The term "recommencement" was used to
create the false impression that construction had stopped.  At her April 16, 2018
deposition testimony, Van Curen testified that she had no knowledge that the
construction had stopped.  To the contrary, she testified that at the time of her one
and only site visit on September 15, 2016—before the October 2016 Hearing—that
there were "20, 25 people working" and Packard Square was merely a 60-65%
complete building in the midst of construction: "It was a construction site ongoing,"
testified Van Curen.  "I'm not saying there was a problem.  I was indicating that the
utilities and mechanical systems were incomplete."  Her testimony was consistent
with the Newbanks report of the exact same date alleged above that there were no
"visually apparent unaddressed deficiencies," and the "overall quality of the
work…appeared to be in general conformance with industry standards and the intent

of the construction plans & specifications."

99.     On February 1, 2017, in a report received in discovery in the Washtenaw County Lawsuit over a year later, the fact that the building was not in disrepair was confirmed by the Receiver's architect, John Tagle, when he stated that the building was "sound, stable and showing no deterioration."

### f.  The Lie about McKinley's and the Proposed Receiver's Expertise

100.    The Defendants falsely caused to be stated at the October 2016 Hearing that McKinley, together with Mason, who would be the Receiver, was "a very experienced local knowledgeable excellent company that could come in" to complete construction.  On or about September 20, 2017, nearly a year after the hearing, Mason as Receiver testified in subsequent Bankruptcy Court proceedings that his "expertise is not construction."

101.    At the October 2016 Hearing the Defendants also caused the following statement to be made about the proposed Receiver by the Receiver's counsel: "This is exactly the kind of project that my client has experience with.  They [McKinley and Mason] know how to take a faltering project and turn it around.  They're known as turn-around experts.  They don't delay things."  That this statement was a lie was later revealed in proceedings on January 10, 2018, at a hearing in the Michigan Court of Appeals.  In an effort to rebut Packard Square's position that McKinley had disqualifying conflicts-of-interest to act as a Receiver because it was an owner and

manager of many existing nearby properties and not a developer like Packard Square, the Defendants' counsel asserted that McKinley was not in the same business as Packard Square.  Describing McKinley and Mason, the Defendants' counsel conceded that McKinley was a manager of existing properties and not a developer, "[N]ot when it comes to ground up construction and development projects" on the "scale" of Packard Square, "that's for certain."

**g.  The Lie Regarding McKinley's Aggressive Schedule**

102.   At the October 2016 Hearing the Defendants falsely represented that "McKinley…has a construction schedule that is very aggressive, very on point that will get the project done in a timely fashion and get it leased up."  Both Van Curen, in her deposition eighteen (18) months later on April 16, 2018, and Defendant Scholz in a Bankruptcy Court hearing on September 19, 2017, approximately a year after the October 2016 Hearing, testified that in fact there was no overall "schedule" until 9 to 10 months after the October 2016 Hearing—thus evidencing the falsity of the Defendants' on-the-record statements at the initial October 2016 Hearing, and that the Defendants' true schedule was and is to consume more than two full years to complete a project that could have been completed by Gleeson and Packard Square within six (6) months after October 2016.

**h.  The Lie about the Retention of Gleeson**

103.   The Defendants caused their counsel to falsely represent at the October

27, 2016 Hearing that they would consider continuing the construction management by Gleeson to complete the project as quickly as possible: "We're here because we want the property completed, leased, up and generating income…I wasn't saying we're telling McKinley who to hire, just that they would consider all options including Gleeson, whatever would take the project forward as quickly as possible." The lie to this statement is proven by an email which included this same attorney of Defendants and was sent from Mason through interstate wires to Defendant Goldman (received in discovery nearly 18 months later) three days before the October 2016 Hearing on October 24, 2016, in which the Defendants agreed that the selection of O'Brien as the general contractor to replace Gleeson was "completed" and that O'Brien was the "cornerstone to our success."   Similarly, Mason, as Receiver, perpetuated this same lie in an affidavit (prepared jointly with the Defendants as reflected in an email sent through interstate wires on August 24, 2017, from the Defendants' counsel to Defendant Goldman, Defendant Scholz and Mason) to the federal Bankruptcy Court by swearing on September 7, 2017, that Gleeson was not chosen to continue as general contractor until "after careful vetting" of Gleeson, when, in fact, Mason never had any communication with Gleeson, and his first act on his first day as Receiver was to bring O'Brien to the Packard Square project and terminate Gleeson.

104.   At the conclusion of the October 2016 Hearing, the State Court, which

allowed no testimony (then or at any time) and relied exclusively on the misrepresentations in the Defendants' moving papers and oral misrepresentations by counsel for Defendants and the Receiver, appointed, as the Defendants had demanded, McKinley as Receiver of the Packard Square project; and Mason, an unqualified employee of McKinley, was specifically designated as "Receiver" with complete and unfettered authority over the project, including all of its claims, control over marketing, leasing, management and all of Packard Square's other developer roles including provisions in the State Court order ("Order Appointing Receiver") to sell the Packard Square project even before a full adjudication of Packard Square's affirmative defenses and counter-claims.

105.   Packard Square was removed from control of its property less than 72 hours after the service of the complaint despite the facts that (i) no loan payments by Packard Square were ever missed or late, (ii) all taxes and insurance premiums were paid by Packard Square on a timely basis, (iii) no city violations had been issued, or allegations of fraud or misappropriation of loan funds were ever made, (iv) more than $20 million was available in unreleased loan interest and construction reserves, (v) the loan maturity date was not until April 1, 2017 and there were extension options until April 1, 2018, (vi) Defendant Scholz later testified on May 2, 2018 that the Defendants had no damages as there was no money due and unpaid at that time, and (vii) Defendants presented no admissible evidence at an evidentiary hearing to

justify the appointment of the Receiver.

106.   A few days after the October 2016 Hearing on or about October 29, 2016, Schubiner emailed Defendant Page after the Defendant Canyon Partners Real Estate had not caused the extension of the milestones as she had promised on August 10, 2016, and instead refused to fund constructions draws, issued bogus default letters, started a foreclosure lawsuit and railroaded through the appointment of the Receiver.  Schubiner wrote, "When you cane (sic.) to the site, why [did] you say, 'that Canyon agreed with me and they were going to extend the milestone dates', if that wasn't Canyon's true intentions?"  Schubiner further wrote, "Do you know how many people are being hurt right now because Canyon hasn't funded for months and is creating a huge problem when there wasn't one.  The contractor needed to be replaced.  That's all.  No shortage of funds.  No excessive delays.  Canyon is the only problem."  Schubiner further wrote, "The least you could do is call me back. Someone from Canyon ought to talk honestly and cordially."  Neither Defendant Page nor anyone else from the Defendants responded to Schubiner's email.

107.   On November 7, 2016, a letter was written to Defendant Page and Defendant Goldman jointly by Packard Square's well-respected team members (as described by Roth in paragraph 68 above) including the project's architect, Built Form, the project's mechanical, electrical, and plumbing engineers, MA Engineering, the third-party construction representative, Spittler Strategic Services,

the construction manager, Gleeson, and the property management and leasing firm, Pinnacle Living. The letter stated, "We have been assisting…the Packard Square development team for many years. Except for C.E. Gleeson…all of us started…well before Canyon's involvement. We are writing to express our consternation about your firm's recent actions to appoint a Receiver…we believe your actions will be counterproductive to the fastest possible completion…Quandel hardly behaved as a professional construction manager…and were rightfully terminated…we believe the Packard Square project to be a one-of-a-kind development…a direct result of the tenacity, vision, leadership, team-building and attention to detail of Craig Schubiner and his staff…We do not understand how a Receiver can get up to speed…and complete the remaining work more expeditiously than by working with Craig, us and Gleeson." The letter continued, "the Receiver's actions…have been troubling (e.g., firing Gleeson, shutting down construction, closing the leasing center, not getting critical work done…not communicating with any of us…) We thought the premise of the Receiver was that they were going to get work done faster. They have actually stopped the work when we have great weather and time-sensitive…critical activities." The letter further stated, "Packard Square's success is the result of Craig's team building and leadership. Forcing him and us to be spectators…two-thirds of the way through appears to be imprudent…Gleeson Constructors has been meeting with Craig for many weeks. They appreciate Craig's

24/7 availability and complete understanding of the details of the Project.  Everyone

gets along beautifully…We urge you to reconsider the termination of Gleeson and

the lack of involvement of Craig Schubiner and the rest of the development team to

complete the…Project in the most expeditious manner.  We invite and encourage

you to meet our team, work with us and your borrower.  This project can be

completed in 4-6 months and there may even be able to have partial occupancies

sooner…Thank you for taking the time to read this letter and please advise when we

can meet with you to complete the Packard Square project in an efficient and

expeditious manner."  Neither Defendant Page, Defendant Goldman, nor any of the

other Defendants ever responded to the letter.

108.   On November 9, 2016, the project's well-respected civil engineers,

Nowak and Fraus ("NFE"), wrote to Schubiner stating

> In light of the recent 'stop of work' at the Packard Square project,
> I wanted to provide Nowak & Fraus'…thoughts about the current
> status...As you know, our two firms have successfully worked on
> several projects together and we certainly feel that this project
> can and will be another success.  We hope that our partnership
> will continue. Your dedication and detailed knowledge of this
> project are invaluable to its success.  ***In addition, we are
> supportive of your decision to terminate Quandel and hire
> Gleeson in their place***. Recently, NFE saw a definite
> improvement when Gleeson took over the supervision of the
> project.  The site progress, in our opinion, was much more
> organized under Gleeson's control.

109.   The NFE's letter concluded by stating, "***We feel that this stoppage of

work has come at the worst possible time***.  We are close to the finish line and with

cold weather approaching, we are concerned that the timing of this delay is going to hurt the project schedule." This letter was forwarded to Defendants Stamolis, Goldman, Scholz and Page on November 9, 2016, and again, none of the Defendants ever responded.

### B. The Defendants' Scheme to Defraud by Manipulating the Receiver

110. Simultaneously with filing the Washtenaw County Lawsuit, the Defendants, at the direction of Defendants Julis and Friedman, caused the sweeping of approximately $20 million from Packard Square's construction reserve account. After the Receiver was appointed, Defendants loaned those same funds to the Receiver at 16% (instead of Packard Square's promissory note rate of 10%) and then charged duplicative loan fees and costs on the new super-priority $19,691,682.86 Receiver Loan (the "Receiver Loan"). The Defendants caused the Receiver Loan to be given super-priority status as part of their pre-meditated plan to cause Packard Square to be responsible for that loan, which Packard Square did not sign, by making the repayment of the Receiver Loan a super-priority prerequisite to refinancing the property.

111. In direct contrast to the onerous October 2014 Loan Documents, the intentionally lax terms of the Receiver Loan were drafted to make it nearly impossible for the Receiver to default while ensuring severely detrimental consequences to Packard Square. A super-priority loan could have been obtained

for a very low interest rate but, consistent with the Defendants' long-term campaign to steal the tens of millions of dollars of Packard Square's equity, the Receiver and the Defendants never attempted to secure a lower rate loan since that would have impaired their scheme to seize Packard Square's equity as quickly as possible. The Receiver Loan also made it difficult, if not impossible, for Packard Square to repay the loan because the Receiver Loan documents contained no language, which allowed Packard Square to pay off the loan.

112.   Over the course of the more than twenty-eight (28) months since the Receiver's abrupt and unjustified appointment, Defendants have purposefully caused the Packard Square project not to be completed. In direct contravention to the Defendants' representations to the State Court that the Receiver had a schedule and would effectuate speedy construction progress, the Defendants' pre-meditated plan was to stop construction altogether for the 2016-17 winter and had no schedule at all for completing construction.

113.   The guise of the Order Appointing Receiver was deviously manipulated to move construction forward very slowly and without consequences in a complete reversal of the overly stringent controls, schedules, milestone requirements, liquidated damage provisions, and bonding requirements, among other tight controls, mandated in the October 2014 Loan Documents. In fact, the Defendants intentionally have held the Receiver and O'Brien to no standards at all. The

Defendants' directions to the Receiver demonstrate they had no legitimate concern regarding the milestone dates in the October 2014 Loan Documents as moving construction forward at a slow pace has been perfectly acceptable to the Defendants.

114. In direct contrast to the Defendants' trigger-finger approach to place Packard Square in default as early and as often as could be fabricated, the Defendants held the Receiver to no budgetary constraints and plainly encouraged the Receiver to proceed at a small fraction of the rate of the Gleeson schedule. Defendant Scholz testified in his deposition on May 2, 2018, that he is not aware of another time that the Defendants from the outset with a regular borrower ever entered into an agreement with no milestone dates, no penalties and no bond. He further testified that the Receiver Loan "*probably has the highest project returns*" of all of the Defendants' loans.

115. Performing construction slowly, which translates to stealing Packard Square's equity quickly, is articulated in contracts the Defendants' approved with third parties. McKinley had secretly executed an agreement, far outside of the intents and purposes of the Order Appointing Receiver, with O'Brien to move construction forward extremely slowly and fraudulently. On or about April 25, 2017, the CEO of McKinley, Albert Berriz signed an agreement with O'Brien (the "Berriz Amendment") which set a completion date of October 2018, two years after McKinley and Mason were appointed Receiver. This two-year timeframe, which

was delayed further, is stunning since, at the time the Receiver and O'Brien took over complete control on November 1, 2016, the building was already 60% to 65% complete, and Gleeson had explicitly undertaken to finish the project within six (6) months of October 2016.

116.   With only 35% to 40% of the work remaining on the project as of the time the Receiver was appointed, the Defendants contrived to require the charging of exorbitant interest and fees to Packard Square for as long as possible by slowing the work to the maximum extent.  The agreement that Berriz signed (and which the Defendants approved) divided O'Brien's work into three exceptionally slow phases that the Receiver and O'Brien acknowledged in an amended agreement of April 25, 2017, "…may reduce or eliminate efficient and economical implementation of the Work which may increase the Contract Sum and Contract Time generally typical to industry standards."

117.   The Berriz Amendment clearly articulates the scheme to dole out funds in slow, small tranches, which increases the contract sum and contract time and which reduces or eliminates efficient and economical implementation of the "Work."

118.   In fact, despite the Defendants' explicit representations at the October 2016 Hearing that the appointment of McKinley and Mason would dramatically expedite the project's completion, not a single apartment had received a certificate

71

of occupancy, and no leases for the retail spaces had been executed or even attempted by the Defendants, as admitted to by Van Curen at her deposition on April 16, 2018.

119.   As of the date of filing this Second Amended Complaint, the Receiver and the Defendants have purposefully ignored all retail leasing opportunities, including multiple valuable leases procured by Packard Square, which were on the verge of execution at the outset of the receivership, including a Papa Joe's Gourmet Market with an integrated Starbucks coffee shop, despite the Defendants' arguing to the State Court at the October 2016 Hearing that it was essential that McKinley and Mason take over all developer roles—even when there were no allegations whatsoever regarding leasing, marketing, management, design, tax increment financing, environmental matters, engineering, and nearly all of Packard Square's duties as developer.

120.   Ignoring the retail leasing has severely compromised the value of the Packard Square project as: i) leased retail space is substantially more valuable than vacant space as there is a predictable income stream in place after being leased successfully; and, ii) increased rents can be garnered from prospective residential tenants when there are known retail amenities in the first floor of the building; conversely, when the retailers are unknown and the retail space is deliberately vacant, the achievable apartment rents are lower, the pace of lease-up of the 249 apartment units is slower, and in turn, significant rental income is lost.  As a result,

the lower rental income stream materially compromises the property value. Defendant Page testified in a deposition in the State Court that the retail is "… fundamental to the overall value of the project. You have income coming from the retail, it also drives visibility for the residents and creates effectively another amenity for the residents" and that it would "very likely" lead to higher residential rent if there are successful retail tenants in place.

121. The Defendants had no good faith basis to remove Packard Square from its developer roles, and as learned 18 months after the October 2016 Hearing, Defendant Goldman, on behalf of Canyon Partners Real Estate, had sent an internal email on September 1, 2016, the month before the October 2016 Hearing, stating that he "really likes [Packard Square's management and leasing] person on the asset."

122. This intentional failure of promised progress during the receivership has had, and will continue to have, dramatically adverse consequences for Packard Square. The motivation and context for this on-going damage is clear, since in common industry practice, a legitimate lender—which the Defendants blatantly are not—would have acted to remove this Receiver for the Receiver's lack of progress. It is patently obvious that the Defendants by their inaction have mandated the intentionally slow rate of construction, and for the retail leasing opportunities to be ignored.

123.    Slow construction is the core motive of the Defendants' scheme to force Packard Square to accrue interest at the exorbitant rate of 16% until its equity is fully stolen.  The deliberately slow construction has also enabled the Defendants not only to deplete Packard Square's equity through the growth of exorbitant interest charges but also through the assessment of millions of dollars of late fees, lawyers' fees, other "professional" fees, and additional exorbitant charges on Packard Square.  The Defendants regularly pay to McKinley and Mason amounts far in excess of what is provided for in the Order Appointing Receiver and have not even insisted that the Receiver competitively bid work in order to control construction costs because they assume Packard Square will be forced to pay all of these excessive costs.

124.    Rather than move "very aggressively" with a schedule "very on point," as the Defendants misrepresented at the October 2016 Hearing, the Defendants in fact have done what Mason and Defendant Goldman secretly agreed in an email exchange sent through interstate wires one day before the October 2016 Hearing in which Mason wrote that they would not "begin construction in earnest until the frost laws are lifted."  As alleged above, there was no valid reason to stop construction until sometime between mid-March and mid-April 2017 because of the frost laws. Nonetheless, the Defendants, once they caused the instant granting of the Receivership by the State Court, immediately supported suspension of construction in full.  This fact was, as previously alleged, later confirmed by Van Curen when she

testified at her deposition on April 16, 2018, that work on the building envelope, mechanical, electrical, fire suppression, insulation and drywall completely stopped in the six months after the Receiver's appointment. Yet, on October 20, 2016, the day before the Defendants caused the filing of the Washtenaw County Lawsuit requesting a Receiver to be appointed, Van Curen sent an email to Defendant Scholz in which she projected that the MEP [mechanical, electrical, plumbing] Rough-Ins would be completed in January 2017. This work was still not completed, as of the date of the Receiver's December 20, 2018 report. This stoppage is also corroborated by the later-discovered facts within the Receiver's bank statements and construction records which reveal little or no construction expenditures for at least six (6) months, as well as the delayed signing of subcontracts until six to 12 months after the Receiver's appointment. To put this in perspective, the Defendants caused the suspension of work until well after Gleeson, the contractor the Defendants replaced with O'Brien, promised to finish the entire project.

125. The Receiver and the Defendants also agreed to pay O'Brien an exorbitant $27.1 million to complete the last approximately $11.2 million of work and to do so without any legitimate risk in stark contrast to the requirement in Quandel's GMP [guaranteed maximum price] contract for $32.3 million to construct the entire project, $5000.00 of daily liquidated damages for late delivery, and a payment and performance bond for $32.3 million. The Receiver and the Defendants

had no concern about grossly over-paying O'Brien because they had shifted all contract costs to Packard Square, while simultaneously the Defendants' 16% interest rate, which was also being charged to Packard Square, accrued on these inflated costs on a super-priority basis.

126.    The Defendants, rather than insist on the continuation of Gleeson as the general contractor, approved the installation of O'Brien as general contractor before the receivership began, even though Gleeson had an experienced team on-site, was oriented extensively with vast knowledge about the project, and had the capability to quickly move forward given its strong relationships with the existing subcontractors.  To exacerbate delays, the Receiver, at the behest of the Defendants, had refused to meet or talk with Packard Square—which was, after all, the owner/developer of the project—or the architectural and engineering firm which designed the building or anyone else familiar with the status or details of the $20 million of construction work that was already in place.  The reason the Defendants did not direct the Receiver to consult with the project architect was because he would have told them that the "winterizing" allegation used to install a Receiver in 2016 was invalid.  He would have told them that it was inexcusable that the Receiver failed in a year's time to complete the very items it argued were urgent and necessitated a receiver in October of 2016, and that the entire building would have been completed by June of 2017 at the latest had Packard Square been left in control

of the project, that the Receiver accomplished very little after a year, and that the Receiver's performance had been purposely behind any commercially reasonable schedule for a project of this magnitude, especially given the status of the construction at the time the receivership began.

127.   Immediately after the Receiver's appointment, the Defendants caused the halting of the leasing efforts altogether in direct contradiction to the Defendants' representation at the October 2016 Hearing that the Receiver "will get this project done in a timely fashion and get it leased up."

128.   To the contrary, after the October 2016 Hearing the Defendants caused the immediate closing of the project's state-of-the-art leasing center and termination of Packard Square's leasing and management agreement with Pinnacle Living, including the termination of the employment of the firm's manager whom Defendant Goldman stated internally a month earlier that he "really like[s]" and that the Defendants described in its draft pre-loan document as "one of the national leaders…clients include more than 235 institutions, pension funds, private partnerships, foreign investors, sole owners and government housing groups."  This evidence was not received until approximately seventeen months after the October 2016 Hearing.  After terminating this nationally renowned leasing and management firm's staff, the Defendants caused the padlocking of the doors of the state-of-the art leasing center, the removing of the project's 400-foot long marketing sign, the

deleting of the project's custom website, and the cancelling of the execution of the fully-negotiated Papa Joe's Gourmet Market lease, which included an integrated Starbucks coffee shop as well as cancelling dozens of apartment reservations and returning those deposits.

129. There was no legitimate rationale for any commercial property owner or the Receiver to intentionally leave vacant the project's valuable retail space, especially in a strong retail market such as Ann Arbor. The Defendants intentionally and fraudulently had not allowed the Receiver to complete the retail leasing so as to artificially depress the project's value until after Packard Square's redemption rights were extinguished following the foreclosure sale.

130. On the initial day of the receivership on November 2, 2017, just as Mason and Defendant Goldman secretly agreed one week earlier, McKinley and O'Brien demanded that all of Packard Square's subcontractors leave the site. For several months thereafter, the Defendants and the Receiver left the subcontractors unpaid, thereby causing approximately two dozen liens to be filed against the title of Packard Square's property. Over six months later when the Defendants and the Receiver began to re-start construction, the Receiver hired back many of the same subcontractors, but only after incurring excessive costs as part of settlement agreements to reimburse them for their damages caused by the stops and starts instigated by the Defendants and the Receiver. Again, the Receiver and the

Defendants had no concern about grossly over-paying subcontractors or the excessive carrying costs caused by their intentional delays because they added all such costs to Packard Square's alleged debt balance along with the 16% interest charges on these inflated costs.  As subsequently learned in March 2019, these excessive costs also caused the completed property's tax assessment to be determined at a later date when property values had increased and based upon exorbitantly inflated construction costs, thereby causing increased operating expenses for Packard Square' property indefinitely.

### C.   The Defendants' Scheme to Defraud Packard Square by Precluding Packard Square from Assuming the Construction Contracts Entered into by the Receiver

131.   The construction contracts between the Receiver and O'Brien (approved by the Defendant Canyon Partners Real Estate and signed on or about March 1 and July 1, 2017) were designed to preclude Packard Square's ability to assume the contracts despite the fact that under Michigan law the Receiver is obligated to act in the best interests of Packard Square.  In derogation of the Receiver's legal duty to act in the best interests of Packard Square, the Receiver-O'Brien contracts provide: "Neither the Receiver nor [O'Brien] shall assign the Agreement…except that the Receiver may assign the Agreement to a lender providing financing to the project [that] is not [Packard Square]."

132.  Like the Receiver-O'Brien contracts, the more than fifty O'Brien

subcontracts (also approved by the Defendants and executed primarily in mid-to-late 2017) contain provisions which were part of the Defendants' fraudulent scheme to steal Packard Square's equity in its property. More specifically, the subcontracts approved and funded by the Defendants and their entities state in their Assignment, Termination and Default language: "The subcontractor further acknowledges and agrees to permit assignment of this Agreement, without written consent, should such assignment be to [an affiliate of the Defendants]…to the Receiver, to an entity formed either jointly or severally by the [affiliate of the Defendants] and Receiver, to a lender of [affiliate of the Defendants] and/or Receiver." This assignment language should have been for the benefit of Packard Square at the conclusion of the receivership, and certainly not a joint venture of the Defendants and McKinley while expressly excluding Packard Square from continuing with the subcontracts once McKinley is terminated.

133. As a consequence, the Defendants corruptly orchestrated it so that subcontracts could be assigned only to the Defendants, its entities, McKinley or their designees. This was all in furtherance of the Defendants' scheme to usurp Packard Square's ownership by causing the Receiver to name itself, in concert with an affiliate of the Defendants, rather than Packard Square as the assignee of subcontracts. Under relevant Michigan law, the assignment language for subcontracts should have been for the benefit of Packard Square, not for the benefit

80

of the Defendants or their affiliates. The lack of ability to assume subcontracts also negatively impacted refinance efforts.

134. Packard Square's efforts to refinance the property were complicated and negatively impacted by its inability to assume subcontracts, Defendants' intentional withholding of amounts due to subcontractors (while charging the 16% default rate of interest to Packard Square on the withheld funds), the excess costs Defendants' demanded that Packard Square reimburse after their funding of settlement agreements with subcontractors, and the intentional failure to lease the project's retail space.

135. In furtherance of the above-described schemes to defraud through the control gained by the appointment of McKinley and Mason as Receiver, the Defendants caused the following funds to be sent between the Defendants' related entity and the Receiver by approximate date, sender, recipient and amount of funds through interstate wires to Michigan from New York and/or California by date and amount of funds:

| Date | Sender | Recipient | Amount |
|------|--------|-----------|--------|
| 11/9/2016 | CAN IV Packard Square LLC | Receiver | $      50,000.00 |
| 11/23/2016 | CAN IV Packard Square LLC | Receiver | $      99,105.02 |
| 12/21/2016 | CAN IV Packard Square LLC | Receiver | $   476,547.80 |
| 1/13/2017 | CAN IV Packard Square LLC | Receiver | $   165,610.59 |
| 1/31/2017 | CAN IV Packard Square LLC | Receiver | $   353,757.69 |
| 2/27/2017 | CAN IV Packard Square LLC | Receiver | $   715,447.70 |
| 3/27/2017 | CAN IV Packard Square LLC | Receiver | $1,440,837.42 |
| 4/24/2017 | CAN IV Packard Square LLC | Receiver | $1,312,079.75 |

| 5/26/2017 | CAN IV Packard Square LLC | Receiver | $   571,099.67 |
| 6/30/2017 | CAN IV Packard Square LLC | Receiver | $1,024,446.14 |
| 7/11/2017 | CAN IV Packard Square LLC | Receiver | $     38,607.99 |
| 7/31/2017 | CAN IV Packard Square LLC | Receiver | $2,665,313.22 |
| 9/5/2017 | CAN IV Packard Square LLC | Receiver | $1,024,836.42 |
| 10/16/2017 | CAN IV Packard Square LLC | Receiver | $1,024,836.42 |
| 10/17/2017 | CAN IV Packard Square LLC | Receiver | $1,818,274.11 |
| 10/17/2017 | CAN IV Packard Square LLC | Receiver | $     79,740.00 |
| 11/21/2017 | CAN IV Packard Square LLC | Receiver | $1,127,904.75 |
| 11/30/2017 | CAN IV Packard Square LLC | Receiver | $   445,304.54 |
| 12/22/2017 | CAN IV Packard Square LLC | Receiver | $1,590,546.78 |
| 1/31/2018 | CAN IV Packard Square LLC | Receiver | $1,779,575.31 |
| 2/28/2018 | CAN IV Packard Square LLC | Receiver | $1,623,244.24 |
| 3/29/2018 | CAN IV Packard Square LLC | Receiver | $2,125,253.06 |
| 4/19/2018 | CAN IV Packard Square LLC | Receiver | $   424,892.00 |
| 4/30/2018 | CAN IV Packard Square LLC | Receiver | $3,420,918.81 |
| 5/31/2018 | CAN IV Packard Square LLC | Receiver | $1,598,676.75 |
| 6/29/2018 | CAN IV Packard Square LLC | Receiver | $2,188,469.56 |
| 7/31/2018 | CAN IV Packard Square LLC | Receiver | $3,025,529.87 |
| 8/31/2018 | CAN IV Packard Square LLC | Receiver | $1,537,251.44 |
| 9/27/2018 | CAN IV Packard Square LLC | Receiver | $1,759,492.09 |
| 10/31/2018 | CAN IV Packard Square LLC | Receiver | $1,563,502.34 |
| 12/18/2018 | CAN IV Packard Square LLC | Receiver | $1,782,564.69 |

## V.   The Defendants' Scheme to Defraud Packard Square by Preventing Packard Square from Refinancing the Defendants' Loans

136.   In response to the Defendants' pattern of racketeering activity, Packard Square secured another lender to refinance the Defendants' loans.

137.   The Defendants, however, refused to provide customary loan payoff letters after a formal request on December 9, 2016.  Packard Square was then forced to file in the State Court a Motion to Compel Canyon and Receiver to Provide Payoff Letters and Accounting.  The order sought in the motion to compel a payoff letter

was finally stipulated to in part and memorialized in a State Court Order dated January 6, 2017. Nearly two months after the initial request for payoff letters, on January 26 and 30, 2017, the Defendant Canyon Partners finally sent through interstate wires payoff letters back-dated to January 24 and 26, 2017, respectively, executed by Plaga as authorized signatory. These payoff letters provided no explanation or customary supporting documentation for the large calculated amounts therein or any justification for the inclusion of legal fees (embedded within multimillion-dollar figures), yet required Packard Square to pay off both of the alleged balances due on the original up to $53.7 million loan and the Receiver Loan the very next day (after receipt of the second required letter) on January 31, 2017 or the payoff letters were rendered null and void. The Defendants' fraudulent one-day timeframe purposefully made performance impossible as refinance lenders, including Packard Square's then proposed new lender, do not make loans for tens of millions of dollars based upon unsupported demands or on less than 24 hours' notice of the alleged loan amounts due.

138. The Defendants' corrupt object was to prevent Packard Square from repaying the loans so Defendants could continue stealing Packard Square's equity.

139. For several months after the January 2017 payoff letters were rendered immediately null and void just one day after Packard Square's receipt, the Defendants repeatedly refused to provide credible information for all amounts

contained within their payoff letters despite many requests from Packard Square. Consequently, Defendants refused to discharge CAN IV Packard Square LLC's mortgages unless Packard Square paid over $50 million (which grew exorbitantly by unknown and unsubstantiated amounts on a daily basis) that the Defendants refused to support with their accounting records.

140. Again, on August 1, 2017, Packard Square requested in writing updated payoff letters with "supporting documentation." Two weeks later, on August 15, 2017, the Defendant Canyon Partners finally sent through interstate wires the requested payoff letters (executed by Kaplan as authorized signatory) but again purposely omitted the requested supporting documentation. The Defendants' August 15, 2017 payoff letters provided only 72 hours to pay off over $50 million or the "payoff statement[s] will terminate," again knowing full well that Packard Square's performance was logistically impossible in such a short time frame and without the requested supporting documentation. After more than seven months of the Defendants' refusals to cooperate and provide information and documentation in a customary fashion for payoff of the mortgage loans, Packard Square's refinance lender cited "deal fatigue" and discontinued its efforts to close the refinancing of the project.

## VI. The Defendants' Fraud on the Bankruptcy Court

141. As a result, Packard Square had no choice but to file for bankruptcy

protection.  On or about September 5, 2017, Packard Square filed a petition in the Bankruptcy Court in the Eastern District of Michigan seeking relief under Chapter 11, including approval to borrow up to approximately $22 million from a DIP [Debtor in Possession] lender, Ardent Financial, LLP, to enable Packard Square to borrow the funds to complete construction as well as cover DIP financing and other ancillary costs of the project.

142.   On October 13, 2017, the Bankruptcy Court dismissed Packard Square's bankruptcy petition because, as the Bankruptcy Court held, "the most important factor in this case, which overwhelms all other factors, is that the Court has denied the Debtor's DIP [Debtor in Possession] Financing Motion" with Ardent Financial.  The Bankruptcy Court denied that financing motion because it held there was not adequate protection for the creditors.  The Bankruptcy Court held that the value of the Packard Square property was not substantially greater than the total of all debts secured by all liens on the property, and therefore an adequate equity cushion would not exist with the addition of the proposed priming lien for the $22 million DIP loan.

143.   In violation of Title 18, U.S.C. § 152, on or about September 19, 2017, the Defendants corruptly caused their so-called expert to make false oaths before the Bankruptcy Court ("September Bankruptcy Hearing"), which resulted in a value of the property that approximately equaled the sum of the alleged existing loan

balances, the alleged lien balances, and the proposed DIP loan.  The Defendants'
material lies presented to the Bankruptcy Court resulted in a completion value of
$81,900,000 or less.  The completion value of the project was manipulated to be
nearly identical to $81,625,346.49, the sum of the Defendants' alleged (and greatly
overstated) existing liens and the proposed DIP loan.  However, in truth and in fact,
the Defendants in an internal email sent through interstate wires from Defendant
Scholz to Defendant Page on October 16, 2016 ("the October 16 Email") produced
in discovery approximately six months after the September Bankruptcy Hearing,
valued the net income for the completed project as $5,876.098, resulting in a
completion value of $98,644,966 for the project, as Defendant Scholz also confirmed
in his later deposition of May 2, 2018, a completion value substantially higher than
the sum of the alleged existing liens and the proposed loan.  Accordingly, the
Defendants' knowing use of this and other false testimony resulted in an
understatement of the value of the project by over 20% and in the Bankruptcy Court
not approving the loan to prime the Defendants' loans, and the court's dismissal of
Packard Square's bankruptcy petition.

144.  In addition to the false testimony of the Defendants' expert, the
Defendants provided other false statements and testimony to the Bankruptcy Court
that further undermined the equity cushion and supported their fraudulent goal of
demonstrating a lack of an adequate equity cushion and upon which the court relied

to deny the DIP Financing Motion and dismiss the action including, but not limited to:

  a. On September 13, 2017, the Defendants caused their counsel to lie by saying legal fees are excluded from the Defendants' July 31, 2017 loan balances, when in truth and in fact, over a million dollars of legal fees were included as part of the loan balances. The Defendants' counsel falsely stated, "It's important to know the Court hasn't decided that any attorney fees can actually be added to the debt. That issue is still up, and the Court has not decided that." Yet, the Defendants caused it to be admitted in Requests to Admit on January 17, 2018 that there were attorney fees embedded within the alleged $38,117,319.33, July 31, 2017 principal balance of the original up to $53.7 million loan. This lie materially understated further the equity cushion by over a million dollars.

  b. On September 19, 2017, Defendant Scholz lied in his testimony in the Bankruptcy Court that there were then "$9,000,000 worth of liens" on the project, which included "5.9 million dollars from Quandel." The $5.9 million Quandel lien included amounts for approximately two dozen subcontractor liens—all of which were caused by Defendants' corrupt failure to fund construction draws.

Defendant Scholz and the rest of the Defendants knew that the $5.9 million figure should have been reduced by nearly $2 million for amounts already paid pursuant to the Defendants' prior approval of settlement agreements and their funding of lien discharge payments to subcontractors including: Construction Ahead, Jermor Plumbing, Sharon's Heating, Evergreen Civil, Michigan Woodwork, RAM, D&V Excavating, JSC Roofing, and Masonry Developers. Moreover, there is reason to believe that Defendant Scholz and the other Defendants knew that the amount Defendant Scholz testified was owed to Quandel was vastly overstated, thereby corrupting further the United States Bankruptcy Court's equity cushion calculations, as the Defendants in the fall of 2018 caused the payoff of the Quandel lien for $600,000 instead of the nearly $6,000,000 that they argued to the Bankruptcy Court was accurate. Furthermore, the Van Curen Supplement stated that there had been an "Overpayment to Quandel [which] totals $3,793,632.21"— clearly adopting Packard Square's position that Quandel owed millions of dollars to Packard Square and nothing at all was owed to Quandel.

c. On September 19, 2017, Defendant Scholz further lied in the

bankruptcy proceeding testifying that the completed Packard Square

project was worth $80 million to $90 million, when in truth and in

fact, the October 16 email valued the net income for the completed

project as $5,876.098, resulting in a completion value of

$98,644,966 for the project.

145.   At the initial bankruptcy hearing on September 13, 2017,  Defendants

caused their counsel to lie when he stated to the Bankruptcy Court, "We believe

there is no equity because the property isn't completed … and the amount of the

liens even if you reduce Quandel's lien to the 5.8 [million dollars] shows that there's

no equity."  The day after Packard Square's bankruptcy petition was dismissed, the

Defendants and the Receiver contradicted their bankruptcy court misrepresentations

and railroaded through the State Court, with less than <u>eight (8) hours</u> for Packard

Square to file a response, an approximately $18 million increase to the Receiver

Loan to $37,458,498.86 and attached to their joint motion an affidavit executed by

the Receiver stating, "I have regularly inspected the Property and I have confirmed

that the conditions of MCL 570.1123(l) will continue to be met.  That is, I find that

the value added to the real property which will result from the construction is likely

to exceed the cost of the additional construction, including all estimated overhead

and administrative costs, together with interest on any funds that are to be borrowed

for the construction."   Immediately after representing to the United States

Bankruptcy Court that the ultimate property value was inadequate to support Packard Square's proposed $22 million loan, the Defendants and the Receiver represented to the State Court that a loan amount more than $15 million higher should be approved because the "value added…will…exceed the cost."

146.    Also, at the first-day hearing in the United States Bankruptcy Court on September 13, 2017, the Defendants caused their counsel to recite multiple additional lies designed to corrupt and manipulate the proceedings, including, but not limited to:

a.  Defendants' counsel stating, "The general contractor [Quandel] now supports the debtor, but still is suing the debtor and Mr. Schubiner personally for fraud, conversion and breach of fiduciary duties…As to Quandel they have their position, you know, and they're still actively suing Mr. Schubiner."  Judge Thomas J. Tucker responded, "This is Quandel?" Defendants' counsel confirmed the lie by responding, "Yes." The judge replied, "And this is alleged where and when?"   Defendants' counsel re-confirmed the lie to the Bankruptcy Court by stating, "This is in the Washtenaw County Circuit Court [the Washtenaw County Lawsuit].  They have a cross claim pending against Mr. Schubiner personally" Judge Tucker replied, "Same case as the receiver case[?]"  Defendants' counsel

again re-confirmed the lie by stating, "Yes, same case as the receiver case."  Yet, in truth and in fact, Mr. Schubiner has never been sued personally in the Washtenaw County Lawsuit by Quandel or any other party.

b. Defendants' counsel stating, "Allowing the receivership to continue is the only way you're going to get this project done…I've attached this article, but to avoid a repeat … about Mr. Schubiner's Bloomfield Park project which said the half-built ruins of Oakland County's biggest development debacle in decades…No one wants to see that in Ann Arbor.  That's what people are concerned about, that's what we faced when we moved for a receivership…We want to avoid more failed ruins." However, Defendants' internally-prepared September 4, 2014 Investment Summary (received in discovery in the Washtenaw County Lawsuit approximately six months later) confirmed the true facts: "A year before construction commenced in 2007, the [Bloomfield Park] property was sold...in August of 2006."   Nonetheless, Defendants caused their counsel to intentionally lie and blame Schubiner for the construction cessation at the Bloomfield Park development knowing full well that his related entities had sold it a year before construction started.

c. Defendants' counsel stating, "they talk about the Receiver has done nothing.  Well, it's hard to believe nothing when they have…30 [apartment] units ready to deliver right at this moment." Four months later on January 17, 2018, in Requests for Admissions signed by Defendants' counsel, Defendants' admitted: (a) the building envelope at the Property has not been completed or fully enclosed with permanent exterior doors, completed siding and all exterior permanent windows; (b) the retail space at the Property had torn plastic visqueen covering the storefronts, was open to the elements, and did not have installed permanent storefronts; (c) elevators were not installed at the Property; (d) the exterior facade of the Property was incomplete; (e) the fire suppression system was not operable at the Property; (f) the fire command center was incomplete at the Property; and (g) there were no operable smoke detectors at the Property.  This lie to the United States Bankruptcy Court is proven by the fact that no temporary or final certificate of occupancy had been issued for any apartment units when the statement was made or even when Van Curen testified over seven months later on April 16, 2018.

d. Defendants' counsel stating, "Mr. Schubiner was sanctioned nine

times in the receivership case for interfering with the receivership,"
when in truth and in fact, Schubiner has never been sanctioned in
the Washtenaw County Lawsuit.

## VII.  Damages

147.   As a result of the Defendants' pattern of racketeering activity in
violation of 18 U.S.C. § 1962(c), on September 21, 2018, the Michigan State Court
entered an order foreclosing on Packard Square's property, accomplishing their goal
of stealing Packard Square's assets and creating a but for and proximate cause of
injury to Packard Square's business and property resulting in the loss of its property
and project worth at least $100,000,000 and lost profits after foreclosure to be
determined at trial.

WHEREFORE, Packard Square demands judgment against the Defendants,
jointly and severally, and in its favor for:

- A. Compensatory and other damages contemplated by and available
  through 18 U.S.C. § 1964(c) for damages actually sustained in the
  amount of at least $100,000,000;

- B. Threefold the actual damages sustained;

- C. The costs of suit and reasonable attorneys' fees; and

- D. Such other relief as the Court deems just.

## COUNT II

## RICO VIOLATIONS OF § 1962(d)

148.   Packard Square realleges and incorporates herein by this reference the allegations in paragraphs 1 through 147 as if set forth fully herein.

149.   From in or about September 1, 2014 to the present, the Defendants Julis, Friedman, Stamolis, Goldman, Scholz and Page, together with others known and unknown, unlawfully, willfully, and knowingly conspired, combined and agreed to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprise pleaded in the alternative above in paragraphs 19 through 23 above, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

150.   In furtherance of this conspiracy the Defendants Julis, Friedman, Stamolis, Goldman, Scholz, Page and others, known and unknown to the Packard Square, committed numerous overt acts in coordination and combination as alleged above in the pattern of racketeering in paragraphs 24 through 147, all of which shows the Defendants Julis, Friedman, Stamolis, Goldman, Scholz and Page consciously agreed to commit the specific predicate acts.

151.   As a result of the Defendants Julis', Friedman's, Stamolis', Goldman's, Scholz's and Page's racketeering conspiracy in violation of 18 U.S.C. § 1962(d), on September 21, 2018, the Michigan State Court entered an order foreclosing on Packard Square's property, accomplishing their goal of stealing Packard Square's

assets and creating a but for and proximate cause of injury to Packard Square's business and property resulting in the loss of its property and project worth at least $100,000,000 and lost profits after foreclosure to be determined at trial.

WHEREFORE, Packard Square demands judgment against the Defendants Julis, Friedman, Stamolis, Goldman, Scholz and Page, jointly and severally and in its favor for:

A. Compensatory and other damages contemplated by and available through 18 U.S.C. § 1964(c) for damages actually sustained in the amount of at least $100,000,000;

B. Threefold the actual damages sustained;

C. The costs of suit and reasonable attorneys' fees; and

D. Such other relief as the Court deems just.

## COUNT III

## FRAUD

152. Packard Square realleges and incorporates herein by this reference the allegations in paragraphs 1 through 151, as if fully set forth herein.

153. The Defendants knowingly and deliberately concealed material facts from Packard Square concerning their scheme to steal Packard Square's property and equity and made affirmative false statements to Packard Square about the loan to Packard Square.

154.   The Defendants made these false statements in an effort to induce Packard Square to enter into the loan agreements with Defendants' special purpose entity created for the purpose of loaning the funds to Packard Square and to construct as much of the project as possible using Packard Square's experience and expertise before applying to the Michigan State Court for a Receiver.

155.   Packard Square reasonably relied on Defendants' material misrepresentations and omissions to its detriment.

156.   At the time of these material misrepresentations and omissions, Packard Square was unaware of the true facts, which Defendants suppressed and failed to disclose to Packard Square.

157.   Defendants' conduct was willful and malicious in that it was intended to cause injury to Packard Square and was perpetrated with conscious disregard for Packard Square, thereby warranting an assessment of exemplary and punitive damages in an amount appropriate to punish Defendants.

158.   As a result of the Defendants' racketeering conspiracy in violation of 18 U.S.C. § 1962(d), on September 21, 2018, the Michigan State Court entered an order foreclosing on Packard Square's property, accomplishing their goal of stealing Packard Square's assets and creating a but for and proximate cause of injury to Packard Square's business and property resulting in the loss of its property and project worth at least $100,000,000 and lost profits after foreclosure to be

determined at trial.

WHEREFORE, Packard Square demands judgment against the Defendants, jointly and severally and in its favor for:

    A. Compensatory and other damages contemplated by and available through 18 U.S.C. § 1964(c) for damages actually sustained in the amount of at least $100,000,000;

    B. Punitive damages; and

    C. Such other relief as the Court deems just.

## COUNT IV

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

159.   Packard Square realleges and incorporates herein by this reference the allegations in paragraphs 1 through 158, as if fully set forth herein.

160.   Under Michigan law, the Receiver, McKinley, has a fiduciary duty to all persons claiming interests in the Packard Square property and is obligated to exercise his office with the utmost good faith and loyalty, including a duty of candor, competence, loyalty, and a duty not to favor the Defendants over Packard Square and its creditors.

161.   In violation of that duty, the Defendants secretly, corruptly and systematically embarked upon a scheme to compromise the Receiver and aided and abetted the Receiver to act in bad faith, violate its fiduciary duty to Packard Square

and treat Packard Square as an adversary and the Defendants as their partners.

162.   Multiple examples of this illicit "partnership" between the Defendants and the Receiver have been revealed only by the limited discovery provided to Packard Square in the Washtenaw County Lawsuit including, among other things, the following emails received by Packard Square in approximately March 2018:

a.    On or about August 24, 2017, Defendants' counsel emailed Defendant Goldman, Defendant Scholz,  Mason, and other representatives of the Receiver, and others to arrange a collective conference call "to discuss the Packard Square affidavits today," thus confirming the conflicts of interest inherent in having lenders and a putatively neutral Receiver collaborate by jointly preparing affidavits for a court filing in opposition to Packard Square;

b.    On or about September 11, 2017, Mason emailed Defendant Scholz: "I will be with [one of Defendants' lawyers] tomorrow morning for the [bankruptcy] hearing.  If he wants to regroup in the [law firm] offices before the hearing.  I will see you then";

c.    On or about September 12, 2017, a lawyer for the Defendants, preparing for the Bankruptcy Court Hearing the next day, emailed Defendant Scholz and Mason regarding "[m]eeting tomorrow before hearing";

d.   On or about September 13, 2017, Defendant Scholz, prior to the Bankruptcy Court Hearing, emailed multiple people including Mason a link to the "ten best pre-mission songs for combat operations, "together with a note outlining "[b]attle songs from [Defendant] Maria [Stamolis]";

e.   On or about September 18, 2017, Mason emailed Defendant Stamolis and Defendant Goldman stating, "I will be prepping for the remainder of the day in preparation for a great outcome tomorrow.  As we prepare for tomorrow's important bankruptcy hearing";

f.   On or about September 18, 2017, further demonstrating the complete alignment between Defendants and the Receiver, Defendant Stamolis emailed Mason: "Thanks Matt [Mason].  Good luck with today's prep and of course with tomorrow.  We would love to catch up after";

g.   On or about December 15, 2017, Defendant Goldman emailed Mason, as Receiver, through interstate wires, and stated: "Many thanks and we appreciate all of your team's efforts on our behalf," and in that same email chain, Mason also sent an email to Goldman through interstate wires, characterizing his and McKinley's relationship with the Defendants as a "partnership";

h.     On or about May 3, 2017, Mason emailed Berriz, the CEO of McKinley, its lawyer and others a celebratory message after the State Court denied two motions filed by Packard Square: "This undefeated streak continues," "I especially like Judge Brown's opinion that Schubiner is merely trying to recycle arguments that were already unsuccessful. Great job, Jim [McKinley's lawyer]," which email Berriz forwarded to [Defendant] Goldman, writing: "FYI...More good news"; and

i.     On or about October 13, 2017, after the Bankruptcy Court dismissed Packard Square's attempt for Chapter 11 re-organization, Defendant Goldman emailed Berriz to inform him of the result, and Berriz and one of the associates responded with emails stating, "Congratulations" and "[t]his is great news."

163.   In the fall of 2017, in anticipation of fully stealing Packard's Square's equity, Defendant Goldman and Defendant Scholz contacted the brokerage firm, Apartment Realty Advisors Midwest, Inc. (commonly known as "ARA Newmark"), about selling Packard Square's property.  Thereafter, the Defendants arranged with the Receiver to list the Packard Square property for sale with ARA Newmark, and a listing agreement was executed on March 19, 2018.

164.   In breach of its fiduciary duty owed to Packard Square, the Receiver emailed to the brokers at ARA Newmark on March 27, 2018, "I noticed that Craig

Schubiner - the Defendant - completed the CA [Confidentiality Agreement].  Please DO NOT include him on the OM [Offering Memorandum] distribution or any future distributions.  Also, please be on the lookout for any other 'Schubiner' names or Bruce Measom [in-house counsel for Packard Square], who is Craig's Lackey."  In response, the broker replied, "Okay.  We will block both names from the list."  Schubiner was not a defendant in the Washtenaw County Lawsuit and rather than allow him or the property owner, Packard Square, to have access to the same information available to the Defendants and the public at large, the Receiver intentionally took steps to preclude Packard Square from exercising its right to review the Offering Memorandum prepared for the sale of its property.  The emails with ARA Newmark were uncovered early this year in response to a subpoena in another related action.

165.   On June 22, 2018, when the Defendants and the Receiver were negotiating to sell Packard Square's property, the Defendants' counsel wrote to the Receiver, "Our client expressly reserves all approval rights relative to the anticipated PSA [purchase and sale agreement] and transactions contemplated in the updated LOI [Letter of Intent]."  In response, the Receiver gave to Defendants the complete authority to approve a sale of the Packard Square property, despite the fact that no such rights are contained within the Order Appointing Receiver.

166.   In the summer of 2018, instead of selling the Packard Square property,

Defendants, at the direction of Defendants Julis and Friedman, decided to foreclose on the property and prepared, with the consent and cooperation of the Receiver, a judicial foreclosure motion in which the Receiver pre-agreed to have the Packard Square property foreclosed upon.  Defendants caused it to be written in their August 2018 motion in the State Court, "Indeed the Receiver consents to the relief requested herein and has offered to stipulate to a Consent Judgment of Foreclosure…"  In response, the Receiver's filing stated that it did not object to the motion to foreclose upon Packard Square's property.

167.   Rather than act in its fiduciary capacity to take all prudent steps to avoid foreclosure and refinance the property's debt, the Receiver, continuing to act in bad faith, agreed to have the Packard Square property foreclosed upon without ever receiving a demand for repayment or a default letter and without an action for foreclosure having been filed against the Receiver Loan.

168.   The Receiver could have refinanced its super-priority Receiver Loan at any time and at a rate significantly below the 16% rate caused to be charged by the Defendants.   Pursuant to Defendant Scholz's September 12, 2018 affidavit, unsupported by any documentation and filed in the Washtenaw County Lawsuit, the super-priority Receiver Loan balance was $33,581,466.09 or only 34% of the $98.6 million property value—a low loan-to-value, easily financeable by industry standards.

169.   Since the receivership began, Packard Square has procured proposed loans from the Davis Companies, Ardent Financial and Bedrock—any one of which would have refinanced the Receiver Loan at a rate significantly below 16%, and as a result, would have avoided foreclosure on the Receiver Loan.

170.   On August 29, 2018, Packard Square attempted to avoid foreclosure on the Receiver Loan by offering both to take assignment of the Receiver Loan and to fully indemnify the Receiver; however, the Receiver never responded to that offer.

171.   In September of 2018, to expedite their premeditated foreclosure and eliminate Quandel's lien from the property, the Defendants and the Receiver, despite together incurring tens of millions of dollars of cost overruns, jointly agreed to pay $600,000.00 to Quandel (*see* paragraph 144, part b above) and simultaneously caused the relinquishment of Packard Square's $32.3 million bond which had insured Quandel's performance—a bond that Defendant Canyon Partners Real Estate demanded to be bought by Packard Square in 2015 to ensure against cost overruns and which requirement delayed the start of substantial construction by approximately seven months.  Other than Packard Square's property, the bond was Packard Square's most valuable asset given its face value of over $32,000,000.00.

172.   The joint relinquishment of the $32.3 million bond by the Defendants and the Receiver contradicts the fact that the Receiver wrote to the bonding company, Western Surety, early in the receivership on February 24, 2017 that, "It is

our determination that the Owner [Packard Square] fulfilled its obligations under the bonds," and again in a letter on March 4, 2017, agreed with Packard Square's position regarding the "ample evidence" of material defaults by Quandel. In its March 4, 2017 letter, the Receiver referenced "the unambiguous language of Section 2 of the Bonds triggering [Western] Surety's obligations to remedy the defaults or complete the Work (as that term is defined in the Bonds)." The aforementioned Receiver's letters to Western Surety were approved by Defendants before being sent to Western Surety but were not provided by the Receiver to Packard Square until approximately November 2017.

173. Their joint relinquishment of the bond also contradicted a lawsuit Defendants caused to be filed against Western Surety on August 8, 2018, *Can IV Packard Square LLC v. Western Surety*, Case No. 2018-167633-CB, Circuit Court, Oakland County, Michigan (the "Western Surety Lawsuit"), wherein Defendants affirmed the Receiver's letters to Western Surety (*see* paragraph 172 above) and adopted Packard Square's factual and legal position regarding at least "29 events of default" by Quandel. The complaint against Western Surety stated that "all conditions precedent under the Bond" have been "met" and damages have been suffered "in the amount of, at least, $14,302,817.41."

174. In their haste to cause Packard Square's property to be foreclosed upon, the Defendants and the Receiver caused the aforementioned $600,000.00 to be

overpaid to Quandel and then added this amount to the alleged balance due from Packard Square, and simultaneously, without justification, abandoned Packard Square's $32.3 million bond despite their clear acknowledgements of a viable claim against the bond in the Western Surety Lawsuit "of, at least, $14,302,817.41."

175.   Beginning on or about October 2018, the Defendants caused weekly foreclosure advertisements to be published, and on November 15, 2018, CAN IV Packard Square LLC foreclosed on the Packard Square property and credit bid an artificially low amount of $75,000,000.

176.   Packard Square's statutory redemption rights run until May 15, 2019, but to exercise those rights and extinguish all alleged debts, it must pay $75 million to Defendants' affiliate, CAN IV Packard Square LLC, plus 16% interest thereon as well as other fees and costs, which Defendants have alleged to total an additional approximately $47 million.

177.   As of February 1, 2019, the Packard Square property was still not completed or leased up and no efforts whatsoever were made to lease the retail space despite the fact that the Receiver had previously sent an email to the brokers at ARA Newmark on March 21, 2018 stating, "Papa Joe's was the market that had a lease ready to sign for the retail space before the receivership occurred.  He also has approval for a Starbucks at the property."

178.   The next day on March 22, 2018, the Receiver sent a follow-up email

to the brokers at ARA Newmark with the cover note, "…attached is the lease that was ready for execution for Papa Joe's gourmet market with an integrated Starbucks…"

179.   At the time the Defendants commenced the Washtenaw County Lawsuit in October of 2016, there was approximately $11.2 million of construction work remaining (*see* paragraph 84 above) and the total balance of the property's debt was approximately $33 million (*see* paragraph 86 above).  This approximately $44 million total, even when adding impending interest charges and other costs, was within the $53.7 million maximum amount of the original loan to Packard Square.

180.   In their October and November 2018 foreclosure advertisements, Defendants caused it to be alleged that the combined debt balance (for the original up to $53.7 million loan plus the Receiver Loan) was more than $83 million—over $50 million higher than the approximately $33 million amount outstanding when Defendants commenced the Washtenaw County Lawsuit.

181.   Neither the Defendants nor the Receiver have been willing to provide documentary support to Packard Square for the alleged $50 million increase or the additional $47 million which Defendants have alleged is also due.

182.   The Defendants fraudulently caused the intentionally low credit bid of $75 million to manufacture a deficiency in their unconscionably inflated and undocumented alleged balance due.   Once the redemption period elapses and

Packard Square's rights to the property are extinguished, Defendants then plan to fill the retail space and sell the project for its full market value while still alleging a deficiency due from Packard Square.

183.    As a result of the Defendants' wrongful actions described herein, on September 21, 2018, the Michigan State Court entered an order foreclosing on Packard Square's property, accomplishing their goal of stealing Packard Square's assets and creating a but for and proximate cause of injury to Packard Square's business and property resulting in the loss of its property and project worth at least $100,000,000 and lost profits after foreclosure to be determined at trial.

WHEREFORE, Packard Square demands judgment against the Defendants, jointly and severally, and in its favor for:

A.    Compensatory and other damages contemplated by and available for damages actually sustained in the amount of at least $100,000,000;

B.    Punitive damages; and

C.    Such other relief as the Court deems just.

## COUNT V

## UNFAIR BUSINESS PRACTICES, CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*

184.    Packard Square realleges and incorporates herein by this reference the allegations in paragraphs 1 through 183, as if fully set forth herein.

185.   By the wrongful conduct, as more fully set forth above, Defendants, and each of them, have engaged in unfair competition including unlawful and fraudulent business practices, in violation of Business and Professions Code § 17200 *et seq*.

186.   As alleged above, the unlawful and fraudulent business practices were primarily directed out of the corporate headquarters of the Defendants Canyon Partners and Canyon Partners Real Estate in Los Angeles, California.

WHEREFORE, Packard Square demands judgment against the Defendants, jointly and severally, and in its favor for:

     A.    Restitution in the form of the return of Packard Square's property or its value of at least $100,000,000 ;

     B.    Disgorgement of profits; and

     C.    Such other relief as the Court deems just.

Dated:  Detroit, Michigan
April 26, 2019

**GIARMARCO, MULLINS & HORTON, P.C**.


By:  /s/ William H. Horton
WILLIAM H. HORTON (P31567)
ELIZABETH A. FAVARO (P69610)
Counsel for Plaintiff Packard Square
101 West Big Beaver Road, Tenth Floor
Troy, Michigan 48084-5280
(248) 457-7000
bhorton@gmhlaw.com
efavaro@gmhlaw.com

## CERTIFICATE OF SERVICE

On April 26, 2019, I certify that I electronically filed this document with the clerk of the Court through the ECF System, which will send notice of such electronic filing to all counsel of record.

/s/ William H. Horton
WILLIAM H. HORTON (P31567)
bhorton@gmhlaw.com

4835-8548-1068\11